**WEISS v. UNITED STATES.**

No. 9735.

Circuit Court of Appeals, Fifth Circuit.

Sept. 11, 1941.

Writ of Certiorari Denied Nov. 24, 1941.

See —— U.S. ——, 62 S.Ct. 300, 86 L.Ed. ——.

For former opinion, see 120 F.2d 472.

Hugh M. Wilkinson and John D. Lambert, both of New Orleans, La., for appellant.

Malcolm E. Lafargue, U. S. Atty., of Shreveport, La., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

The attorneys for appellant say that this court, in defiance of the evidence, adopted the conclusion that Weiss and Hart started out with a general conspiracy to defraud; that the authorities cited by the court really favor appellant if more carefully analyzed; and that the majority opinion is thought to "result from a lack of complete familiarity with the facts of the case."

Having read the record and briefs, we think we understood this case and covered it in our original opinion; but, in response to the petition for a rehearing, we shall review the salient points at issue and state at length the reasons for the decision of which counsel complain.

First, we have a question of duplicity which goes to all three counts on which appellant was convicted. The use of the mails is the gist of the offense, but there is no claim of duplicity in the mailing part of the charges. The contention is that two schemes are alleged, one to raise the contract price, the other, twelve months later, to make fictitious claims for extra work. At this time we need to consider only the first three counts, but later, when we come to rulings upon the admissibility of evidence, we must remember that appellant was tried upon an indictment in nine counts, the last of which was for conspiracy to commit the substantive offenses charged in the first eight counts.

The scheme was to obtain money fraudulently from the State of Louisiana in the sum of approximately $56,914.42. The defendants named in the indictment were appellant, senior member of a firm of architects, and Monte E. Hart, an active member of the firm of contractors which was the lowest bidder for certain construction work on the campus of the Louisiana Polytechnic Institute. The architects were employed upon a percentage basis to draw the plans, superintend the bidding, prepare the contract in accordance with the accepted bid, and superintend the construction.

The indictment alleges that it was a *part* of the scheme that appellant, acting as architect, would fictitiously and fraudulently add to the accepted bid upon one of the buildings the sum of $27,000; that Hart, the contractor, would then approve and sign the contract for the increased amount, after which appellant would present the same to the President of the State Board of Education for his signature, at the same time concealing from the latter the fact of said increase. As a further *part* of the scheme, it is alleged that the defendant Weiss was to prepare and present fraudulent architects' certificates covering extra work and material furnished by the contractor.

A third *part* of the scheme was to conceal copies of said contract from Weiss' associate architectural firm and others, and to conceal the facts from the persons to be defrauded by failure to list the extras covered by the architects' final certificates upon which payment was authorized, demanded, and collected. It is then alleged that many false pretenses and fraudulent representations were made by the defendants for the purpose of inducing the payment of said fictitious amount of approximately $56,914.42. Some of these fraudulent representations are specifically alleged, but the indictment does not undertake to set forth all of them. Numerous other details of the scheme are set forth in the indictment at great length, the increase in the contract price and the overcharges for extras being only parts of the same plan to obtain money from the state through its agencies and institutions. The gist of the scheme was to increase the total cost of the building by raising the bid and by fictitious extra charges. The alleged scheme and its execution cover a period of more than a year, beginning in the early part of 1936. It is expressly alleged that the artifice to make false charges for extra work was a part of the scheme to obtain the approximate amount of money mentioned in the indictment.

Having stated positively that this court, in defiance of the evidence, followed the attitude of the district attorney and the trial judge in adopting the conclusion that Weiss and Hart started out with a general conspiracy to defraud, which embraced cheating at both ends of the job, and made any letter written in the middle of the job a use of the mails in execution of both the raise in the contract price in 1936 and the padding of the extra bill in 1937, counsel

repeat: "We say that this conclusion is reached in defiance of the evidence, because the record was absolutely bare of anything on which to rest the assumption that when Weiss is said to have cheated on the contract price in 1936 he then had any idea that either he or Hart was going to cheat on the final extra bill in 1937. The assumption accepted by the court denies the possibility of any progression from one scheme to another in the alleged fraudulent careers of Weiss and Hart in connection with this Louisiana Polytechnic job."

 With deference to counsel, their statement is incorrect in several material particulars. In the first place this court did not follow the attitude of the trial judge and the district attorney, if they ever had such attitude, of adopting the conclusion that Weiss and Hart were guilty of any conspiracy. Where a conspiracy to commit the offense is charged, there is a third element, not involved in the commission of the substantive offense: An intent to use the mails in execution or attempted execution of the fraudulent scheme.[1] The appellant was found not guilty on the only conspiracy count in the indictment, and the charge of conspiracy is not before us. In the next place there is no issue before us on this appeal which requires or required us to adopt such conclusion; the issue which counsel had in mind probably was whether or not there was evidence before the jury to warrant a finding that appellant schemed to defraud for extras prior to the fraudulent use of the mails set forth in the first count.

We take it that the attorneys who wrote the brief believed the statement, or they would not have made it, and that they meant what they said, or they would not have repeated it. We further presume that there was in their minds some basis for the statement; and, there being no basis in fact, it is evident that the statement was based upon an erroneous opinion of the law, their idea being that the conviction of appellant could not stand unless the evidence proved that Weiss and Hart started out in 1936 with a complete scheme to defraud "which embraced, then and there, the alleged cheating at both ends of the job." We do not subscribe to this view of the law. The period of more than a year that elapsed between the surreptitious upward revision of the contract and the fabrication of the final bill for extras was merely the time required to erect the building and obtain the money under the architects' final certificate. The completion of the building was necessary to the complete execution of the scheme to defraud, but not to a use of the mails in furtherance of the scheme.

 The intention to devise a scheme to defraud necessarily precedes the formation of any such scheme, but the completion of the entire scheme is not necessary to a violation of the statute. An intention to devise a scheme to defraud or for obtaining money by false pretenses is sufficient if enough of the scheme is formed to constitute an offense and the mails are used for the purpose of executing or attempting to execute the part which is completed. Such completed portion of the scheme must be actually devised, but if one's mental processes have definitely reached that stage, the use of the mails is prohibited for the purpose of executing it or attempting to execute it.

 A single scheme to defraud may involve a multiplicity of ways and means of action and procedure. It may be such that the complete execution of it would involve the commission of more than one criminal offense. Mere details may be changed and the scheme remain the same. As the execution of the scheme (or the intention to devise the scheme) proceeds, new ways may be adopted or invented to effectuate the original design. The important thing is that the scheme, or the inten-

---

1 United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548; Erbaugh v. United States, 8 Cir., 173 F. 433; Farmer v. United States, 2 Cir., 223 F. 903; Trent v. United States, 8 Cir., 228 F. 648; Hendrey v. United States, 6 Cir., 233 F. 5; Preeman v. United States, 7 Cir., 244 F. 1; Depew v. United States, 3 Cir., 255 F. 539; Robins v. United States, 8 Cir., 262 F. 126; Burns v. United States, 10 Cir., 279 F. 982; Newingham v. United States, 3 Cir., 4 F.2d 490; Morris v. United States, 8 Cir., 7 F.2d 785; Silkworth v. United States, 2 Cir., 10 F.2d 711; Tincher v. United States, 4 Cir., 11 F.2d 18; Van Riper v. United States, 2 Cir., 13 F.2d 961; Mitchell v. United States, 9 Cir., 23 F.2d 260; Beck v. United States, 8 Cir., 33 F.2d 107; Cohen v. United States, 3 Cir., 50 F.2d 819; Smith v. United States, 5 Cir., 61 F.2d 681; United States v. Weisman, 2 Cir., 83 F.2d 470; Bogy v. United States, 6 Cir., 96 F.2d 734; Goodman v. United States, 3 Cir., 97 F.2d 197.

tion to devise it, shall remain the same. The variety of means which may be employed in the execution thereof is limited only by the ingenuity of the schemer. The statute is violated if, having devised or intending to devise a scheme to defraud, the mails are used for the purpose of executing such scheme or attempting to do so.[2] It is not necessary that when the artifice was devised the schemers shall have worked out all the details of its execution.[3] The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.

As was said by this court in McLendon v. United States, 5 Cir., 14 F.2d 12, on page 14: "The language of section 215 of the Criminal Code does not indicate that the lawmakers intended to enable one who uses the mails in furtherance of a scheme to defraud to obtain immunity for so doing by making the commission of a plurality of crimes a part or feature of his scheme."[4]

In Sasser v. United States, 5 Cir., 29 F. 2d 76, the indictment was in twenty counts. The scheme was set out in detail in the first count, and adopted by reference in all the other counts, the only material difference between the counts being that a different letter was set out in each, and alleged to have been mailed to some one of the banks intended to be defrauded. This court held that every part or element of the scheme as alleged in the indictment need not be proven, but that it was sufficient to prove enough to constitute an offense. In Gourdain v. United States, 3 Cir., 154 F. 453, it was held that various means used in committing the offense may be joined without duplicity.

■ The theory upon which the indictment in the court below was drawn was that there was but one scheme, which was to obtain money by fraud in connection with the building contract. The proof adduced in support thereof was convincing in the minds of the jury. There was substantial evidence to support the verdict.

The fact that the mails were employed in executing a part of the scheme immediately after it was devised and at various times before the entire scheme was completely devised is no defense under the statute.[5] This court is not divided on this phase of the case.

■ We turn to the question of appellant's intent. Did he know what he was doing, or was he the innocent instrument of guilty associates? The evidence shows beyond contradiction that he is guilty as charged in the first three counts of the indictment, unless, as he claims, he was shamefully imposed upon by Hart, who committed suicide before the trial of this case. Appellant was the architect whose certificates made it possible for thousands of dollars to be fraudulently obtained by Hart under the contract. Appellant admits that he increased the contract price, but says Governor Leche authorized him to do it. The latter testified to the contrary, and the jury resolved the conflict against appellant. This of itself with the other direct evidence was sufficient to warrant the jury in rejecting the plea of innocent intent without the evidence of other frauds in which Weiss participated and which was admitted solely upon the issue of guilty intent. Appellant also negligently issued the architects' certificates that enabled Hart to obtain from the state by fraud some $29,000 under the guise of extra work; but it is argued that negligent conduct is not necessarily criminal, which is true and the court below so instructed the jury. One is presumed to intend the natural and probable consequences of one's acts, but that presumption may be easily rebutted by the evidence, even by the uncorroborated testimony of the defendant himself if the jury believe it.

With the issue thus sharply drawn as to Weiss' guilty intent, the trial court permitted the district attorney to introduce evidence of Weiss' participation in other frauds against the state in which he claimed to have been the innocent instrument of

---

[2] Sec. 215, Criminal Code, 18 U.S.C.A. § 338.

[3] Muench v. United States, 8 Cir., 96 F.2d 332.

[4] Cf. Bailey v. United States, 5 Cir., 5 F.2d 437, which holds that a conspiracy to commit several offenses may properly be included in the same count of an indictment, citing, among other authorities, Frohwerk v. United States, 249 U. S. 204, 39 S.Ct. 249, 63 L.Ed. 561.

[5] Cf. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232, where an indictment for conspiracy under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, alleged numerous methods employed by the defendants to restrain trade. The court held that it was not necessary to prove every means alleged, but it was error to charge that a verdict might be permitted on any one of them when some of them would not warrant a finding of conspiracy. Nash v. United States, 5 Cir., 186 F. 489, reversed.

the true criminal. The evidence related to similar frauds perpetrated about the same time, and the court below restricted it solely to the question of intent. The district judge pointed out that, while he thought some of the evidence tended to show Weiss' participation in the benefits of those frauds, yet, upon the insistence of the district attorney, he restricted its admission to the point of intent.

Let us consider the theory upon which such evidence is admissible. The general rule is that evidence of another crime unconnected with the one on trial is inadmissible, but this rule is subject to a number of exceptions, the first of which is that evidence of other offenses by the accused is admissible to show his criminal intent as to the offense charged, where the other offenses are similar to and not too remote from that charged, and where intent is in issue as an element of the offense charged. Another exception is where the evidence of a separate crime tends to explain, illustrate, or characterize the act charged when such act is capable of more than one construction. Another is to rebut a claim of mistake or inadvertence. An exception also applies where the crime charged is one of a series of swindles or other crimes involving a fraudulent intent, or where the crime charged is part of a plan or system of criminal action. It is clearly admissible in prosecutions for obtaining money by false pretenses. The length of time over which an inquiry as to other offenses may extend is within the sound discretion of the trial court.[6]

The above evidential instances of collateral facts are generally referred to as exceptions to the relevancy rule, but it is not really accurate to call them either collateral facts or exceptions where mere intent is sought to be proven. On this subject Greenleaf says: "In some cases, however, evidence has been received of facts which happened before or after the principal transaction, and which had no direct or apparent connection with it; and therefore their admission might seem, at first view, to constitute an exception to this rule. But those will be found to have been cases, in which the *knowledge* or *intent* of the party was a material fact, on which the evidence, apparently collateral, and foreign to the main subject, had a direct bearing, and was therefore admitted. * * * Cases of this sort, therefore, instead of being exceptions to the rule, fall strictly within it." Greenleaf on Evidence, Vol. 1, pp. 68-70, citing Gibson v. Hunter, 2 H.Bl. 288, and other cases.

From Reynolds on Evidence, 4th Ed., p. 13, we quote the following: "Thus, where the question is whether an act done by A. was committed with a fraudulent intent, his fraudulent conduct to third parties in similar transactions about the same time is a. relevant fact to show his animus (McAleer v. Horsey, 35 Md. 439, 461; Bottomley v. United States, 1 Story 135, 3 Fed. Cas. [page] 968 [No. 1,688]; Castle v. Bullard, 23 How. 172 [16 L.Ed. 424]; Lincoln v. Claflin, 7 Wall. 132 [19 L.Ed. 106]; Mutual Life Ins. Co. v. Armstrong, 117 U. S. 591 [6 S.Ct. 877, 29 L.Ed. 997]); and so, also, where there is a question as to whether an act was accidental or intentional, the fact that such an act formed part of a series of similar occurrences, in each of which the person doing the act was concerned, is a relevant fact to show intention on his part (Ste.Dig., art. 12; Dunn's Case, 1 Moo.C.C. 146; R. v. Cooper, L.R. 1 Q.B.D. (C.C.R.), 19; Bottomley v. United States, 1 Story, 135, 3 Fed.Cas. [pages] 968, 971 [No. 1,688]; Wood v. United States, 16 Pet. 342, 360 [10 L.Ed. 987]; Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591 [6 S.Ct. 877, 29 L.Ed. 997]; Com. v. Eastman, 1 Cush. [Mass.] 189, 48 Am.Dec. 596)."

The evidence that appellant argues was erroneously admitted in the court below bears solely upon the question of criminal intent, and falls under the first so-called exception above mentioned. It was not admitted for the purpose of showing design or system, as the attorneys for appellant contend. It is important to keep this fact in mind, because the principles upon which the elements of intent and system may be evidenced are slightly different in degree. To follow the contention of appellant would lead us into "a misapplication of the stringent theory of design or system to a case where the theory of intent alone is involved."[7]

---

[6] Moore v. United States, 150 U.S. 57, 14 S.Ct. 26, 37 L.Ed. 996; Lynch v. United States, 4 Cir., 12 F.2d 193; United States v. Sebo, 7 Cir., 101 F.2d 889;

22 C.J.S., Criminal Law, § 683, pp. 1091, 1093 and note 68, p. 1096 and note 73, § 691, pp. 1132, and 1133.

[7] Vol. 1, Wigmore on Evidence, p. 619.

█ In proving intent by other similar offenses, the act is conceded or assumed or left to the jury; what is sought is the state of mind that accompanied it, and the jury are instructed not to consider the evidential instances of other similar offenses until they find the act to have been done and are proceeding to determine the intent. The argument as to admissibility is purely from the point of view of the doctrine of chances. The multiplication of similar instances in which Weiss was overreached by a false friend or by false friends may, by logical processes in the minds of the jury, eliminate the element of innocent intent in the offense charged. Wigmore says that the mind intuitively applies this process of reasoning, namely, "that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element to be the true explanation of them." He gives this graphic illustration (Vol. 1, p. 611): "Thus, if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim or B's accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i. e. as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small; or (to put it in another way) because inadvertence or accident is only an abnormal or occasional explanation for the discharge of a gun at a given object, and therefore the recurrence of a similar result (i. e. discharge towards the same object, A) excludes the fair possibility of such an abnormal cause and points out the cause as probably a more natural and usual one, i. e. a deliberate discharge at A. In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i. e. criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offence according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent. The general canon of logical inference already examined (ante, sections 31, 32) is here applied and illustrated."

█ When the attempt is merely to discover the intent accompanying the act in question, a united system is not essential to the application of the rule. The doing of other similar acts, whether part of a scheme or not, is material in reducing the possibility that the act in question was done with innocent intent. If a competent bookkeeper makes a single error in his favor, several other similar errors in his own favor in the same year tend to exclude the explanation of casual error, but there must be a similarity in the various instances in order to give them probative value.

"It is just this requirement of similarity which leaves so much room for difference of opinion and accounts for the bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction and in cases of the same offence. Some judges incline to treat the judicial test of probative value as identical with the common-sense test, and to admit such instances as bear a similarity liberally interpreted by the standard of every-day reasoning. Other judges set their faces firmly against every instance which is not on all fours with the offence in issue, regardless of the consideration that justice consists quite as much in protecting the public against evil doers as in showing mercy to those whose guilt has been more or less skillfully concealed. It is hopeless to attempt to reconcile the precedents under the various heads; for too much depends on the tendency of the Court in dealing with a flexible principle. One Court will be certain to exclude everything that is not too clearly probative for even technical quibblers to oppose, and sometimes will exclude even that. Another Court will accept whatever has real probative value. Something, however, may perhaps be gained by realizing, as to the former, that it is not the law, nor precedent, nor principle, nor policy, that will account for such rulings, but merely a rooted inclination to take the stricter view and a preference to err in favor of criminals and against innocent victims." Wigmore on Evidence, Vol. 1, p. 615.

In Moore v. United States, 150 U.S.: 57, at page 60, 14 S.Ct. 26, at page 27, 37 L.Ed. 996, the court said: "We think it was within the discretion of the court to admit

the testimony in dispute of Kitty Young. As intimated in the case of Alexander v. United States, 138 U.S. 353, 11 S.Ct. 350 [34 L.Ed. 954], where the question relates to the tendency of certain testimony to throw light upon a particular fact, or to explain the conduct of a particular person, there is a certain discretion on the part of the trial judge which a court of errors will not interfere with, unless it manifestly appear that the testimony has no legitimate bearing upon the question at issue, and is calculated to prejudice the accused in the minds of the jurors. There are many circumstances connected with a trial, the pertinency of which a judge who has listened to the testimony, and observed the conduct of the parties and witnesses, is better able to estimate the value of than an appellate court, which is confined in its examination to the very words of the witnesses, perhaps imperfectly taken down by the reporter. It was said by Mr. Justice Clifford, in delivering the opinion of this court in Castle v. Bullard, 23 How. 172, 187 [16 L.Ed. 424], that 'whenever the necessity arises for a resort to circumstantial evidence either from the nature of the inquiry or the failure of direct proof, objections to the testimony on the ground of irrelevancy are not favored, for the reason that the force and effect of circumstantial facts usually, and almost necessarily, depend upon their connection with each other.' And in Hendrickson v. People, 10 N.Y. 13, 31 [61 Am.Dec. 721], it is said that 'considerable latitude is allowed on the question of motive.' "

■ Where the question is one of fraudulent intent, the rule is the same in civil and criminal cases. See Wood v. United States, 16 Pet. 342, 10 L.Ed. 987, where the court so held and stated that it has always been deemed allowable to introduce evidence of other acts and doings of the party of a kindred character in order to illustrate or establish his intent or motive in the particular act directly in judgment. "Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty." 16 Pet. 342, 358, 10 L.Ed. 987. In Butler v. Watkins, 13 Wall. 456, 464, 20 L.Ed. 629, the court said: "In actions for fraud, large latitude is always given to the admission of evidence." In Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997, the court held that a repetition of acts of the same character naturally indicated the same purpose in all of them, and said that evidence of other frauds tended to establish the charge in the case on trial of a premeditated purpose to cheat and defraud. See also Spurr v. United States, 6 Cir., 87 F. 701.

The propriety of evidencing intent for all sorts of offenses by multiplying instances of the same result is illustrated by text writers and approved in repeated judicial utterances; for example:

If a man were gambling with dice, and lost one hundred times consecutively, the presumption would be that the dice were loaded or crookedly shaped. Upon a charge of fraud committed by means of begging-letters, if a single letter were proved, the evidence might be insufficient; but the particular transaction is shown to be a guilty one by proving that the person charged has done the same thing twenty times before, and that in each case he has told false stories and given fictitious names. Suppose the defendant were tried for breaking and entering a store with intent to steal, and the only question were whether he intended to steal; suppose he had broken and entered recently ten other stores on the same street and had stolen something from every one of them: his robbing the other stores would tend to show that he intended to rob the one in the case on trial, just as his passing counterfeit money in a number of recent instances would tend to show that he intended to pass counterfeit money found in his possession. Suppose he had robbed persons instead of stores, going from one end of the street to the other knocking them down and robbing them; suppose, when he had knocked the last one down and before he had had time to rob him, he had been arrested and the question were whether his last offense were an attempt to rob, a mere assault, or an assault with intent to kill: it seems clear that evidence of this class would be admissible. It is not conclusive, but it tends to show intent in the case on trial.

Judge Story is quoted as follows in Bottomley v. United States, 3 Fed.Cas. page 968, 971, No. 1,688, 1 Story 135 (to show defendant's fraudulent intent in undervaluations of imports, other instances were offered): "But it appears to me clearly

admissible upon the general doctrine of evidence in cases of conspiracy and fraud, where other acts in furtherance of the same general fraudulent design are admissible; first, to establish the fact, that there is such a conspiracy and fraud; and, secondly, to repel the suggestion, that the acts might be fairly attributed to accident, mistake, or innocent rashness, or negligence. In most cases of conspiracy and fraud, the question of intent, or purpose, or design in the act done, whether innocent or illegal, whether honest or fraudulent, rarely admits of direct and positive proof; but it is to be deduced from various circumstances of more or less stringency, and often occurring, not merely between the same parties, but between the party charged with conspiracy or fraud and third persons. And in all cases, where the guilt of the party depends upon the intent, purpose, or design, with which the act is done, or upon his guilty knowledge thereof, I understand it to be a general rule, that collateral facts may be examined into, in which he bore a part, for the purpose of establishing such guilty intent, design, purpose, or knowledge. * * * [After illustrating by the doctrines about counterfeit money, stolen goods, etc.] In short, wherever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, tending to establish such intent or knowledge, are proper evidence."

The following is said by Cushing, C. J., in State v. Lapage, 57 N.H. 245, 294, 24 Am.Rep. 69: "Another class of cases consists of those in which it becomes necessary to show that the act for which the prisoner was indicted was not accidental,—e. g., where the prisoner had shot the same person twice within a short time, or where the same person had fired a rick of grain twice, or where several deaths by poison had taken place in the same family, or where children of the same mother had mysteriously died. In such cases it might well happen that a man should shoot another accidentally, but that he should do it twice within a short time would be very unlikely. So, it might easily happen that a man using a gun might fire a rick of barley once by accident, but that he should do it several times in succession would be very improbable. So, a person might die of accidental poisoning, but that several persons should so die in the same family at different times would be very unlikely. So, that a child should be suffocated in bed by its mother might happen once, but several similar deaths in the same family could not reasonably be accounted for as accidents. So, in the case of embezzlement effected by means of false entries, a single false entry might be accidentally made; but the probability of accident would diminish at least as fast as the instances increased." See also MacKnight v. United States, 1 Cir., 263 F. 832.

The following is by Taft, J., in Penn M. L. Ins. Co. v. M. S. B. & T. Co., 6 Cir., 72 F. 413, 422, 19 C.C.A. 286, 38 L.R.A. 33: "It is a well-established rule of evidence that, where the issue is the fraud or innocence of one doing an act having the effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same general subject-matter. The legal relevancy of such evidence is based on logical principles. It certainly diminishes the possibility that an innocent mistake was made in an untrue and misleading statement, to show similar but different misleading statements of the same person about the same matter, because it is less probable that one would make innocent mistakes of a false and misleading character in repeated instances than in one instance." See, also, Mudsill Mining Co. v. Watrous, 6 Cir., 61 F. 163, opinion by Judge Lurton, concurred in by Judges Taft and Ricks.

Involved in the verdict of guilty under counts one, two, and three, and supported by substantial evidence, there is the finding of the jury that the scheme to defraud alleged in said counts was devised prior to May 30, 1936, when the contract was drawn, and was continuously in the process of execution or attempted execution until July 7, 1938, when the final check for $25,000 was paid to Caldwell Brothers & Hart under the contract, $20,000 of which sum was attributable to the architects' certificates of Weiss, Dreyfous & Seiferth, signed by Weiss; the extra $5,000 was not authorized by Weiss' certificates.

During the above period of over two years it appears that the contractors, Caldwell Brothers & Hart, acting in concert with the appellant, who represented the architects, fraudulently obtained the sum of $56,914.42 of state funds under the contract for the construction of an administration and class room building at the

Louisiana Polytechnic Institute. The amount of the original bid was $264,082.13. The amount paid the contractors was $362,835.35, all but $5,000 of which was paid under architects' certificates signed by Weiss without inspection of the work or any report from his associate architects. During this same period, Weiss himself testified, he was engaged on numerous other jobs including a charity hospital, a physics and mathematics building at Louisiana State University, a law school building at Louisiana State University; also an auditorium, a dormitory, and a library.

As stated by the court below, it seems strange that, although the firm of Neild, Somdal & Neild were to supervise the work and be upon the ground where the opportunity to observe its progress and carefully to check any extras would be afforded, these duties were taken over by Weiss in New Orleans, who did not send a member of his firm to the scene during the progress of the work, and who issued his certificates based merely upon reports as to the quantities furnished by the supervisor on the ground, not including any prices, evidently getting his prices from the contractors without checking or knowing whether those prices were correct. If we examine the evidence of other similar offenses relied on by the Government in chief to show intent, we find they were of exactly the same nature: false and fraudulent charges and overcharges for construction work at state institutions going on at the same time. The total amount paid to Caldwell Brothers & Hart for three buildings (the library, a power house, and renovation to Warren Easton Hall) was $636,464.79. The architects not only got their commission, but during this period Hart was buying stock of questionable value from a dairy corporation sponsored by Weiss. The checks for the stock were made payable to Weiss, who receipted for and received the certificates and kept them

in his possession until this whole matter was being investigated and made public. We are listing below the checks that Hart gave Weiss without demanding or obtaining possession of the stock certificates.[8]

The percentage of profit made by the contractors for extras on the Tech job, approved by architects' certificates signed by Weiss, was approximately three hundred per cent, according to the witness Lancaster whose testimony, as to worth, weight, and credibility, was for the jury.

Comparing some of the alleged collateral frauds, let us take the library building at Normal, having the same contractors and architects, Weiss signing all architects' certificates. The cost was $102,283.13, to which extras were added in the sum of $101,389.46 which were accounted for only in part. On the power house at Normal no contracts were entered into, and no record of bids was found; but the architects set up a price on their certificates of $286,113.13; to this sum extras were added totalling $76,121 plus a payment of $3,664.50. The total paid the contractors for the building was $365,898.63, which gave the contractors a profit of $147,219.01 or 67.32 per cent. The next is the Warren Easton Hall job, which was not new construction. No contracts or bids could be found, but the contractors were paid a total of $66,895.67; their books reflected a cost of $32,427.51, leaving a profit of $34,468.16 or 106.29 per cent. On the library building at Normal certificates by the architects were issued to cover the furnishing of the book stacks and fixtures in the sum of $56,492.65. According to their records, Caldwell Brothers & Hart purchased the same from dealers who put them in for the sum of $41,000, resulting in a profit to the contractors of $15,492.65 for which they did nothing.

When J. B. Lancaster was designated by the Supervisor of Public Accounts to make

---

8 All checks were made payable to Leon C. Weiss, and signed by Caldwell Brothers & Hart. The dates and amounts were as follows: Dec. 11, 1935, $10,000; Jan. 16, 1936, $18,000; May 16, 1936, $10,000; June 10, 1936, $5,000; July 8, 1936, $2,500; Jan. 11, 1937, $2,000; Oct. 29, 1937, $5,000; March 18, 1938, $5,200; May 18, 1938, $5,000; July 18, 1938, $2,500; Dec. 23, 1938, $10,000; Jan. 23, 1939, $1,000; Jan. 24, 1939, $1,000.

With reference to the above checks, the court below said: "The evidence shows this dairy concern was insolvent at the very time when some of these large checks were being paid out to Mr. Weiss, and the jury might conclude that the dairy company was a mere front or sham for the purpose of covering up the receipt of these sums of money out of the sums that had been realized from this transaction. The testimony showed some of these checks, at least, passed into his private bank account." (R. 1190.)

an audit of this Polytechnic Institute job, he called upon Weiss in August, 1939, for a statement of the extras that went into the building; Weiss said he was very busy; he promised to supply the information later; but he never did so. It was August 18, 1939, when Weiss delivered the dairy corporation stock certificates to Hart.

 The evidential instances of such extraneous or collateral frauds as were introduced in the court below were admitted in evidence, not because they tended to prove that Weiss was guilty of other offenses, but in spite of that fact.[9] They were admitted as circumstantial evidence to prove the intent with which Weiss assisted in perpetrating upon state agencies the scheme to defraud charged in the indictment. The sole reason for their admission was their weight and value upon the issue of intent in the commission of the crime charged. It was not necessary to show a prior conviction of the defendant of such extraneous offenses; it was only necessary to prove the acts of the accused constituting such offenses by competent and material evidence which tended to show, beyond a reasonable doubt, the intent of the accused in the case on trial. It was immaterial whether or not any federal crime was committed except the particular one charged in the indictment. For instance, Weiss was charged below with using the mails to defraud, and the evidence of other frauds of a similar nature committed by him at or about the same time was relevant, competent, and material to show intent in the scheme charged whether or not the mails were used or intended to be used in the perpetration of such other frauds.[10]

It is the mere repetition of similar instances that satisfies the logical demand of the fact-finding tribunal. Yet, it is necessary that prior or subsequent acts should be similar, since it is the improbability of a like result being repeated by mere chance that carries probative weight; the essence of this probative weight is the similarity of the instances. In ruling upon the defendant's objections to this evidence, the court below said: "I am going to permit the Government to prove any transactions in which Mr. Weiss in connection with Mr. Monte Hart or this firm approved payments to be made to them, or fees that were paid to himself in connection with these matters, to illustrate his intentions." (R. 640.)

Later, the court said: "As indicated in previous rulings in matters of this kind the Government will be allowed to prove such transactions as happened in the dealings in which Caldwell Brothers & Hart were the contractors and this defendant or his firm of architects which are of a similar nature and transpired along about the same time as this transaction as throwing light on the question of intent on the part of the defendant in his conduct in connection with the case on trial and matters arising in the case on trial. When a situation arises that warrants it the Court will hear enough of the evidence to determine its admissibility out of the presence of the jury and then decide whether that transaction is to go to the jury. The evidence sought to be brought out at this time appears to me to be admissible and the objection is overruled." (R. 641.)

---

[9] "It has already been noted (ante, Sec. 216) that the criminality of prior acts thus offered does not affect their admissibility. Either they are relevant, by the above tests, or they are not; if they are not, they are rejected because they are irrelevant; if they are, they are received in spite of their criminality. The only bearing of the latter quality is that, if they are irrelevant, it furnishes another reason for excluding them, namely, the reason of Undue Prejudice, as enforced in the Character rule (ante, Sec. 194); for these other criminal acts would not merely be irrelevant, but would go to evidence the defendant's character and career as bad and thus to create undue prejudice,—a mode of argument against him that is forbidden by a fundamental principle.

"It is, however, to this reluctance to violate the Character rule that is due the strictness shown by the Courts in excluding prior criminal acts which do not strictly fulfil the rigorous tests just examined. If the admission of irrelevant evidence had been the only consequence of an error in the ruling, there would undoubtedly have been seen a greater liberality in the judicial application of the foregoing tests. The unsatisfactory result has been that, in this narrow and over-cautious anxiety not to infringe upon the Character rule, evidence highly appropriate to show Knowledge, Intent, or Design, and amply fulfilling the proper tests for that purpose, has often been excluded." Wigmore on Evidence, Vol. 1, Sec. 305.

[10] Packer v. United States, 2 Cir., 106 F. 906.

688

The court below adhered strictly to this ruling. It is well settled that such evidence is admissible in mail fraud cases where limited to the question of intent. In Packer v. United States, 2 Cir., 106 F. 906, the fraudulent intent being the principal issue, the court held that other similar transactions conducted by the defendant a year prior to those charged in the indictment were not too remote as to time, since not infrequently the limit of time must rest practically in the discretion of the trial judge.

In Byron v. United States, 9 Cir., 259 F. 371, the court held, on a trial for using the mails to defraud, that evidence that defendant had previously defrauded other persons by means of a similar scheme was admissible where limited to the question of intent. See, also, Riddell v. United States, 9 Cir., 244 F. 695; Hallowell v. United States, 9 Cir., 253 F. 865.

In Samuels v. United States, 232 F. 536, 542, 146 C.C.A. 494, 500, Ann.Cas.1917A, 711, the Circuit Court of Appeals of the Eighth Circuit said: "As the fraudulent intent is one of the material allegations in the indictment, evidence of other and similar ventures by the accused [is] properly admissible as bearing on the question of intent. The intention of a person charged with a crime can hardly ever be shown by direct evidence, and for this reason it is permissible to introduce evidence of other acts of a similar nature, especially when committed continuously and for a long period of time, thereby establishing the fraudulent intent." See also Farmer v. United States, 2 Cir., 223 F. 903, 139 C.C.A. 341; Stern et al. v. United States, 2 Cir., 223 F. 762, 139 C.C.A. 292; Sprinkle v. United States, 4 Cir., 141 F. 811, 816, 73 C.C.A. 285; Shea v. United States, 6 Cir., 236 F. 97, 149 C.C.A. 307.

■ The next point is the only one which was specifically mentioned in the dissenting opinion. Error is assigned to the cross-examination of appellant about, and the introduction in evidence of, a cashier's check for $75,000, dated June 15, 1938, payable to Leon C. Weiss. The court below admitted this evidence for its bearing upon the dairy transaction. It was not introduced by the district attorney as a part of his case in chief, but was elicited from Weiss on cross-examination. This evidence tended to show that, while the scheme alleged in the indictment was being executed by Weiss and Hart,[11] Weiss by his endorsement assisted Smith in defrauding Louisiana State University out of $75,000 claimed by Dr. Smith to be due Weiss for architectural services. It did not show who got the money, except by the endorsements on the check, and Weiss himself testified: "It is perfectly obvious, I believe, that I received nothing from that check. Is that correct?" To which there was no reply by counsel and no contradictory testimony by any witness. It was not necessary to prove Weiss' knowledge of Smith's fraudulent intent. See Wigmore on Evidence, Vol. 1, p. 637, Sec. 321(2).

The evidence with respect to this check was admissible for several reasons, the first of which is that the questions of the district attorney that elicited it related to a proper subject of cross-examination. This is especially true since Weiss had said that the check was intended as a loan for improvements at the dairy plant, and later had claimed that it was tendered him by Smith for consulting and architectural fees. The only evidence before the jury on this subject was the check itself and Weiss' testimony. The check was endorsed by Weiss, J. M. Brown, and Fenner & Beane.[12]

In addition to its inherent relevancy to Weiss' intent in the offense charged in the indictment, this so-called extraneous fraud was admissible to prove contradictory statements by Weiss himself. According to his own admission on the stand, he first told a federal investigator that: "The seventy-five thousand dollar transaction occurred in this way: I had in mind an improvement which would have required some seventy-five thousand dollars to effect. I discussed the necessities of the case with Dr. Smith and he promised to get this money for me. A cashier's check in my favor was tendered me by Dr. Smith but I had decided not to engage in this venture nor to borrow this considerable amount of money so I indorsed the check and returned it to him and I received nothing in connection with the transaction. The enterprise that I was considering at the time was the construction of the modern

11 The devising of the scheme continues as long as the scheme is in process of execution. Farmer v. United States, 2 Cir., 223 F. 903; Van Riper v. United States, 2 Cir., 13 F.2d 961; Brady v. United States, 9 Cir., 26 F.2d 400.

12 Fenner & Beane are stock brokers on the New Orleans and other exchanges.

dairy plant for the Southern Dairy Products, Incorporated."

After the above statement had been read to Weiss and he had stated that it was in accordance with what he remembered at the time, he was asked what he intended to do with the money he had gotten from Hart which caused him to need $75,000 more from Dr. Smith. This was a very pertinent question, because we have heretofore listed numbers of checks to Weiss from Caldwell Brothers & Hart that Weiss claimed were in payment of stock in the dairy corporation and the Government claimed were in payment of appellant's part of money fraudulently obtained. By the above statement, Weiss linked the Smith check to contemplated dairy improvements, and said nothing about it being offered him for consulting and architectural fees. On the witness stand he admitted that, after giving further thought to the matter, he had changed his narrative so that it read as follows: "My statement was correct to the effect a check made in my favor was tendered me by Dr. Smith and I indorsed the check and returned it to him and received nothing in connection with the transaction. However, this check did not represent the financial assistance to the dairy which I had discussed with Dr. Smith. The seventy-five thousand dollar transaction arose in this manner: On or about the date mentioned, June 15, 1938, Dr. Smith brought to me a check for seventy-five thousand dollars stating that it represented a payment on account of amounts due me for consulting and architectural services. After brief reflection I informed Dr. Smith there was no such amount then due and payable to which he replied he must have erroneously had the check issued against an old architect certificate or bill; whereupon, he stated that in as much as the check had been issued I should retain it and issue my own check in refund therefor. Accordingly, I indorsed the check and called my bookkeeper and instructed him to issue a check in refund payable to . Louisiana State University which he did as the stub shows. However, it immediately occurred to me that was a cumbersome method of handling the transaction involving my deposit of the check and issuing my own against it, especially as it really represented no income receipt as far as I was concerned. Therefore, I suggested to Dr. Smith that he merely take the check and redeposit it or have it redeposited. In the meantime, I had indorsed the check in contemplation of the issuance of my own check in exchange for it as above stated. Dr. Smith took the check back and that is the last I ever heard about the transaction which occurred more than a year ago."

Upon being asked by the district attorney which statement was correct, Weiss replied that he thought it was perfectly obvious that the later statement was correct. We think the court committed no error with reference to this item of $75,000, not only because the questions by the district attorney were proper ones on cross-examination, but because the evidence tended to show that Weiss had aided Smith in perpetrating a fraud upon the State University; and the evidence of such fraud was admissible to show intent as to the offense charged in the indictment. The gist of Weiss' defense was that he had been betrayed by Hart; and if the Government could show, as it did show, that he was also claiming to have been betrayed during the same period by Smith, another false friend, the evidence pressed directly upon the issue of Weiss' intent in the case on trial. Conceding that Smith got the money, the jury were entitled to consider the admitted facts of the transaction in so far as they related to the issue of appellant's intent in the scheme alleged in the indictment.

It was for the jury to accept either of Weiss' explanations, or to reject both of them. Weiss had been asked about this check by investigators before the trial, had given inconsistent explanations on the subject, and had every reason to expect it to come up on the trial, because he was presumed to know that his defense to the indictment would be a plea of innocent intent and that, under the law, evidence of similar frauds would be admissible to show intent.[13] Extrinsic offenses do not have to be identical, and this fraud was as similar to the fraud on trial as it could well be without being identical. Smith needed Weiss' endorsement on the cashier's check to get the money; Hart needed Weiss' signature to the architects' certificates; and the state was the party defrauded in each and every instance. Both frauds were being executed at the same time, with Weiss claiming to be the dupe in each scheme. Both frauds took money from

---

[13] Wigmore on Evidence, Vol. 1, Sec. 305.

a state institution—Hart's for fictitious contractual services, Smith's for fictitious architectural services. Weiss certified for Hart and endorsed for Smith. The question of criminal intent was for the jury.

 The cross-examination of appellant by the district attorney with reference to the Leche contract hardly seems to be of sufficient importance to mention, as we think its omission would not have changed the result of the trial; but since it is the only bit of evidence in the ten-days trial, now assigned as error, which we have not covered in principle in our discussion of this case, we will say that counsel for appellant created the basis for the admission of this evidence by offering testimony with respect to Weiss' standing and reputation. The effort was to convince the jury that Weiss was strictly and ethically an architect of unusual ability, who did not himself take building contracts, who could easily be imposed upon by contractors, and who was so imposed upon by Caldwell Brothers & Hart. Weiss himself, in his testimony, had also stressed the fact that he was not a contractor but an architect of artistic temperament. Therefore, the court below committed no error in permitting the district attorney to ask Weiss on cross-examination if he had not signed a contract with Richard W. Leche to construct a home for said Leche, if he had not built said home, and if his so doing was not contrary to the canons of the American Institute of Architects. Weiss admitted that he had signed said contract and built said home; he denied that what he did was unethical, and was permitted to explain fully the entire transaction. There was no attempt to impeach the witness on this portion of his testimony, and his explanation went to the jury without contradiction by any other witness. The district court has a wide discretion in determining the scope of cross-examining witnesses, and there was no abuse of discretion in this instance.

 In his motion for a new trial appellant complains "that the district attorney on at least one occasion stated in unqualified terms to the jury that the defendant Weiss had gotten $150,000, $75,000 from the contractor, Caldwell Brothers & Hart, and $75,000 from Dr. Smith." We are unable to find anything in the record to show exactly what was said by the district attorney in his argument to the jury or what preceded it. No objection was made to the argument at the time; no motion was made requesting the court to enter a mistrial or to instruct the jury to disregard it; and no bill of exceptions is found in the record on the subject of an improper argument to the jury by the district attorney. The argument that large sums of money were paid Weiss by the contractors was amply justified by the evidence; and we have previously pointed out that Weiss' testimony was uncontradicted when he said that it was perfectly obvious that he got nothing out of the proceeds of the check which he endorsed and gave back to Dr. Smith. It is only in cases of clear abuse by the district attorney that a verdict should be set aside for improper argument. The court below thought there was no merit in this ground of the motion for a new trial, and, in view of the state of the record, this matter was entirely within its discretion.

 Counsel for appellant claimed surprise with reference to this same check, which was delivered to Fenner & Beane to margin Smith's operations in the stock market. It is rather unusual to have an attorney claim surprise at evidence elicited when his own client is on the stand, and we think the claim is without merit in this case. The following from Wigmore on Evidence bears directly upon the objection of unfair surprise:

"Of the other objections (than Undue Prejudice) from the point of view of that auxiliary policy which creates the Character Rule (ante, Sec. 194), the objection of Unfair Surprise is the only one that could be supposed to be here applicable. But it has never been treated by the Courts as of consequence. This rational and practical conclusion is easily understood when it is remembered that any other conclusion might result in shutting out most of the appropriate evidence, of this and other sorts, to prove a crime. The legal objection of Unfair Surprise, so far as it is ever recognized, is not founded on the notion that the opponent was not in fact anticipating this specific evidence (post, Sections 1845, 1849), but on the notion that he could not have anticipated evidence which might easily be fabricated beyond detection; and the objection is recognized as having force only when the evidence offered is of a class capable of involving the entire range of the person's life. Evidence tending to show, not the defendant's entire career, but his specific knowledge, motive, design, and the other immediate matters leading up to and

succeeding the crime, is of a class always to be anticipated and is in each given instance rarely a surprise; moreover, the kernel of the objection of unfair surprise, namely, the impossibility of exposing fabricated evidence, is wanting where the evidence deals with matters so closely connected with a crime as design, motive, and the like:

"1804, Ellenborough, C. J., in R. v. Whyley, 2 Leach Cr.L., 4th ed. 985: 'The observation respecting prisoners being taken by surprise and coming unprepared to answer or defend themselves against extrinsic facts is not correct. The indictment alleges that the prisoners uttered this note knowing it to be forged; and they must know that without the reception of other evidence than that which the mere circumstance of the transaction itself would furnish, it would be impossible to ascertain whether they uttered it with a guilty knowledge of its having been forged, or whether it was uttered under circumstances which showed their minds to be free from that guilt.'" Sec. 305, Vol. 1, pp. 620-621, Wigmore on Evidence.

If appellant and his attorneys were surprised by the introduction in evidence of the check for $75,000, which appellant had endorsed, and by the questions propounded to appellant by the district attorney on the subject, what was said by the Supreme Court with reference to a similar contention in Mulhall v. Keenan, 18 Wall. 342, 350, 21 L.Ed. 808, is so directly in point that we quote therefrom as follows: "If there were surprise, the only remedy for it was a motion for a new trial. Such a motion was made, supported by the affidavits of Mulhall, his counsel, and others, and was overruled by the court. With that motion and its result we have nothing to do. They cannot be made the subject of review by this court. Our duty is to ascertain whether there is any error in the record of which we can take cognizance. We have found none, and the judgment is affirmed."

The court below, in overruling the motion for a new trial which was properly addressed to its sound discretion, said: "Then in addition to that I do not think the point made by Mr. Wilkinson at the present time with regard to this seventy-five thousand dollar check justifies me in allowing a new trial in this case. Mr.

Weiss took the stand and told his story, not only with regard to that, but with regard to every transaction mentioned in this case, how it happened, and the jury heard that and had the benefit of his entire explanation of it, and how it all came about. To say that the jury used that one incident in order to find the defendant guilty in this case I do not think would be true. I think it is a collateral matter that is not of such importance to this case as to justify the Court in setting aside the verdict and granting a new trial. To say that it disclosed a fraud upon which the jury acted, or disclosed a fraud sufficiently impressive to have caused the jury to find the verdict it did in this case, I do not think is true, and the motion for a new trial will be overruled."

The above ruling of the district court was in harmony with the following well-settled legal principles applicable to the granting of new trials by courts of original jurisdiction:

Surprise, as a ground of setting aside a verdict, should be cautiously allowed. A new trial cannot be obtained on the ground of surprise caused by evidence which was clearly within the pleadings. (This principle is applicable here, because the plea of not guilty put appellant's criminal intent in issue, and evidence of the commission of collateral frauds was directly relevant to show his intent in the scheme charged in the indictment.)

New trials on account of after-discovered evidence should be granted with great caution. The trial court, in order to set aside the verdict on this ground, must be satisfied that the evidence has come to the applicant's knowledge since the trial; that it is not owing to lack of diligence that it did not come sooner; that it is so material that it will probably produce a different result; and that it is not cumulative, as mere cumulative evidence is insufficient to warrant a new trial.

This court has held that no exception lies to the overruling of a motion for a new trial.[14] In Payton v. Ideal Jewelry Mfg. Co., 1 Cir., 7 F.2d 113, 114, where the defendant moved for a new trial on the ground of after-discovered evidence, the court said that the evidence was largely cumulative and was not of a character that would change the result. Such being the case, the defendant took nothing

---

[14] Luitweiler v. United States, 5 Cir., 85 F. 957.

by this assignment. In Streckfus Steamers v. Shuttleworth, 4 Cir., 86 F.2d 327, the court said that, with respect to the refusal to set aside the verdict and grant a new trial for after-discovered evidence, nothing is better settled in the federal courts than that this is a matter resting in the sound discretion of the trial judge. In Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884, 892, the court said that granting or refusing a new trial upon the ground of newly discovered evidence of a contradictory and impeaching character rests in the sound discretion of the trial court.[15]

The evidence in this case is both direct and circumstantial. The direct evidence shows that appellant raised the figures of the contract $27,000 above the bid without consulting either the State Superintendent of Education or the President of the Board of Education, and that these officials knew nothing about it until an audit was made in the late summer or early fall of 1939. There is also direct evidence as to the fraudulent charges for extra work and material. Unexplained, this evidence tends to support the charge of fraud, because both the architects and the contractors profited substantially by the increased cost of the building, and the state was wrongfully deprived of the corresponding amount. The architects' commissions on this job alone amounted to $22,398.34. Admitting overpayment, part of this sum has been refunded or adjusted.

 Weiss' explanation, as we have seen, presented a conflict in veracity between himself and ex-governor Leche that warranted the jury in rejecting it entirely if they believed it had been falsely and corruptly uttered. Counsel for appellant argue (as if they were before a jury and not an appellate court) that Leche's testimony was not true; but we would be invading the province of the jury if we rejected it. He was a competent witness, and his credibility was for the jury; also the nature and purpose of the above listed checks from Caldwell Brothers & Hart to Weiss, as well as the direct evidence of facts tending to show numerous similar frauds during the same period, were for the jury. It was peculiarly within their province to weigh and value all of this evidence, and to determine whether or not Weiss intended to defraud as charged in the indictment.

 The argument that evidence of similar offenses should not be received unless the guilt of the accused is admitted or appears from clear and convincing evidence fails to distinguish between the competency, relevancy, and admissibility of evidence on the one hand, and its worth, weight, and sufficiency on the other; the former being for the court and the latter for the jury. The commission of other frauds may be proven in the same way that any other competent, relevant, and material facts may be established. Evidence tending to prove them is submitted for the consideration and evaluation of the jury, and the issue is whether or not, from a consideration of all the evidence, the jury believe beyond a reasonable doubt that the defendant on trial is guilty as charged in the indictment, except where the proof depends upon circumstantial evidence, in which event the guilt of the accused must be shown to the exclusion of every reasonable hypothesis of innocence. Take the above-mentioned illustration of the man charged with intentionally shooting his hunting companion, his defense being that the gun was discharged accidentally: it would be necessary to prove only the felonious firing of the shot alleged in the indictment, but testimony of the facts and circumstances relating to the first two shots would be relevant and material as bearing directly upon the issue of intent in firing the last shot. In passing upon the admissibility of such evidence, the court does not determine its weight or value (or the credibility of the witness giving the testimony) but only its competency and relevancy upon the issue of intent in the act charged. The jury are not required to draw any inferences as to the intent of the accused in firing the first two shots, the mere repetition of instances being for the consideration of the jury upon the question of intent in the act charged.

 In the case now under review the only inference of Weiss' intent which the jury needed to draw related to the scheme charged in the indictment wherein he claimed to have been the dupe of Hart. As to the other building frauds which Hart

---

[15] See also Glenberg v. United States, 6 Cir., 281 F. 816; Salmon Falls Mfg. Co. v. Midland Tire & Rubber Co., 6 Cir., 285 F. 214; Wulfsohn v. Russo-Asiatic Bank, 9 Cir., 11 F.2d 715, 718; Chambers v. Anderson, 6 Cir., 58 F.2d 151.

admittedly perpetrated on the state, and in which Weiss claims to have been an innocent actor, the evidence was admissible, not to prove Weiss' guilt in the other frauds (which was immaterial), but as tending to show his intent in the scheme on trial. As Lord Coleridge, C.J., said, a man may be many times the dupe of another, but it is less likely he should be so oftener than once.[16] In the trial below the jury did not necessarily find that Weiss had not been duped by Hart or Smith in any of the extraneous instances in evidence, but only that Weiss was not duped in the scheme charged in counts one, two, and three of the indictment.

The court below committed no reversible error, and we would be usurping functions which do not belong to an appellate court if we should set aside the verdict and judgment in this case. Since neither of the judges who concurred in our original decision is of the opinion that the petition for a rehearing should be granted, the same is denied.

---

[16] Reg. v. Francis, [1874] L.R. 2 Crown Cas. 128.