**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John T. GOODWIN, Defendant-Appellant.**

**No. 73-1294.**

United States Court of Appeals,
Fifth Circuit.

April 19, 1974.

Fred A. Jones, Jr. (Court-appointed), Richard W. Aschenbrenner, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Carol M. Anderson, Miami, Fla., for plaintiff-appellee.

Before TUTTLE, BELL and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

On March 16, 1972, the federal grand jury for the Southern District of Florida returned an indictment charging, *inter alia:* that appellant, John T. Goodwin, imported approximately 1000 pounds of marijuana, a Schedule I controlled substance, into the United States in violation of 21 U.S.C. § 952(a); and that Goodwin, along with Allen Charles Ritsema, Wilbur Roger Hansen, and "divers other persons whose names are to

the Grand Jury unknown," conspired to import into the United States and possess marijuana in violation of 21 U.S.C. § 963. The indictment contained several other counts accusing Ritsema, Hansen, and one Patrick Angelo Zaccheo, Jr., of additional substantive offenses; Ritsema and Hansen entered guilty pleas to certain substantive counts, and the government dismissed all other charges against them, including the conspiracy count. Goodwin, however, was not arrested until November 30, 1972, at which time he was in the water about 500 yards off the coast of Key Largo, Florida. Pursuant to Goodwin's arrest, customs agents seized approximately 3000 pounds of marijuana. On January 23 and 24, 1973, Goodwin was tried before a jury and was found guilty both of importing and of conspiring to import marijuana. He was sentenced to five years imprisonment and a two year special parole term on each count, the two sentences to run concurrently.

On this appeal Goodwin seeks to have his conviction reversed for any of four alleged errors on the part of the district court. First, appellant contends that the court erred in failing to grant his motion for acquittal after the conspiracy charges against the other alleged co-conspirators had been dismissed. Second, Goodwin argues that the court should have granted various motions for directed verdict of acquittal because the evidence presented at trial was insufficient to support a conviction. Third, Goodwin claims that several comments by the prosecutor during closing argument were prejudicial, and that the court erred in denying motions for a mistrial on that basis. Finally, appellant maintains that the trial court erred in permitting the government to introduce testimony regarding his arrest while committing a similar offense nine months after the crime charged herein. We find the first two assignments of error unpersuasive. As to the third contention, we believe that at least one of the statements in the government's closing argument exceeded the limits of permis-

sible prosecutorial zeal, and that the district court erred by failing, at a minimum, to provide a corrective cautionary instruction to the jury. Finally, after careful study of the record in this case and the decisions of this Circuit, we conclude that the district court committed prejudicial error by admitting evidence of subsequent similar conduct on the part of appellant. We therefore reverse for a new trial.

I.

 Appellant argues that because conspiracy charges against his alleged co-conspirators, Ritsema and Hansen, were dropped he should have been acquitted. This Court has followed the general rule that the conviction of only one defendant in a conspiracy prosecution will not be upheld if all other alleged co-conspirators are acquitted. Farnsworth v. Zerbst, 5 Cir. 1938, 98 F.2d 541; United States v. Peterson, 5 Cir. 1974, 488 F.2d 645, 651. The reason for the rule is obvious: at least two persons must join in an unlawful enterprise in order for a conspiracy to exist. The dismissal of conspiracy charges against Ritsema and Hansen, however, did not leave a situation in which fewer than two persons remained who could have joined in the crime. The conspiracy count of the indictment charged, in addition to Goodwin, Ritsema and Hansen, "divers other persons whose names are to the Grand Jury unknown." Testimony was presented at trial which specified at least five persons other than those named in the indictment who apparently were involved in the alleged conspiracy. A person can be convicted of conspiring with persons who are not identified by name in an indictment so long as the indictment asserts that such other persons exist and the evidence supports such an assertion. *See* Rogers v. United States, 1950, 340 U.S. 367, 375, 71 S.Ct. 438, 95 L.Ed. 344, 350. This is no less true simply because the co-conspirators named as codefendants in the indictment were not prosecuted for conspiracy. United States v. Ca-

brera, 5 Cir. 1971, 447 F.2d 956; Jenkins v. United States, 5 Cir. 1958, 253 F.2d 710. In Rosecrans v. United States, 5 Cir. 1967, 378 F.2d 561, we held that the defendant's conspiracy conviction was not invalidated by the acquittal of his five named codefendants, particularly because

> Count One of the indictment (the conspiracy count) charged that Rosecrans conspired not only with his five codefendants, but with divers other persons to the grand jury unknown, and the written statements made by Rosecrans to the F.B.I. agents and evidence adduced at the trial showed persons other than Rosecrans and his five codefendants were parties to the conspiracy.

378 F.2d at 567. We reject appellant's first claim of error.

## II.

■ The government's case rested on testimony indicating a conspiracy among a number of people, including appellant, to import marijuana from Jamaica on the MARIA, a boat captained by a man named "John Goodwin." The government sought to link the seized marijuana with the MARIA, and then to identify appellant as the captain of the MARIA. Appellant argues that the government did not show beyond a reasonable doubt that he was the same "John Goodwin" who was captain of the MARIA, and thus failed to establish a nexus between him and the marijuana. The crime for which appellant was being tried occurred in February 1972; appellant was not arrested until November 30, 1972, while apparently involved in another incident of importing marijuana. Goodwin argues that the government arrested him for the latter incident, and when they discovered his name was the same as that of the man charged in the present indictment, placed him on trial for this offense.

Two alleged co-conspirators, Allen Charles Ritsema and Richard Delise (who was not charged by name in the indictment), testified as to the identity of the captain of the MARIA. Asked if he saw "John Goodwin" in the courtroom, Ritsema pointed to appellant and said, "I'm reasonably sure that is him there." After the court denied a motion to strike that testimony, Ritsema added: "It has been over a year since I have seen him. He had much longer hair and a mustache then." Delise was unable to identify appellant as the John Goodwin who captained the MARIA; in fact, he described the boat captain as being "five foot, 170 or 160 pounds" with long hair and a mustache—a description substantially different from that of appellant in every particular. Also on the issue of identity, Customs Agent William Buchanan testified that he had observed appellant at the address where the MARIA was docked on the evening of February 24, 1972, the date of the crime charged herein. Except for the critical issue of identity, all elements of the government's case were soundly established.

The standard for review of the denial of a motion for directed judgment of acquittal, firmly established by this Court, is

> whether, taking the evidence most favorable to the Government, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, the jury might reasonably conclude that the evidence is inconsistent with the hypothesis of the accused's innocence. United States v. Warner, 5 Cir. 1971, 441 F.2d 821, 825; United States v. Andrews, 5 Cir. 1970, 427 F.2d 539, 540; Surrett v. United States, 5 Cir. 1970, 421 F.2d 403, 405. If the evidence is such that a reasonable person *may* have a reasonable doubt as to the defendant's guilt, the case should be submitted to the jury. On the other hand, a trial judge should not permit a case to go to the jury if the evidence is so scant as to allow the jury merely to speculate or to conjecture as to the defendant's guilt. In other words, a motion of acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is

such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged.

United States v. Stephenson, 5 Cir. 1973, 474 F.2d 1353, 1355. In the present case the government asserts that the identification testimony of Ritsema and Agent Buchanan was sufficient to present the issue to the jury, and that Delise was an unresponsive witness, who drew admonishment from the court and whose testimony could not have been credible to the jury. Based upon our own review of the evidence, we can say only that "a reasonable person *may* have [had] a reasonable doubt as to the defendant's guilt"; we cannot say that a reasonable person *must* have had such doubt. The district court properly submitted the evidence to the jury.

### III.

Goodwin alleges that the government, in its closing argument, made at least three misstatements of fact, and at least one other highly prejudicial comment to the jury, and claims that the trial court erred in denying motions for mistrial on those grounds. We shall review the allegedly offensive statements seriatim.

■ First, appellant observes that the Assistant United States Attorney represented Agent Buchanan as testifying that he saw Goodwin "at the dock in the rear of the residence in Pompano Beach," when Buchanan actually had testified only that appellant had arrived "in front of this residence." Appellant made no objection at trial to the government's misstatement. We are satisfied that this inadvertent mistake on the part of the prosecutor could not have so affected appellant's substantial rights as to constitute plain error.

■ Second, Goodwin notes that the government incorrectly stated that "Mr. Ritsema positively identified the captain as John Goodwin, the defendant here in

the courtroom." In fact, Ritsema had testified that he was only "reasonably sure" that appellant was the John Goodwin who had captained the boat. The third misstatement of fact cited by appellant was the government's incorrect representation of witness Delise's description of "John Goodwin" as being "five foot, seven inches tall." Actually Delise had testified that the John Goodwin he had known was only five feet tall, much less similar to appellant in height than his description as represented by the Assistant United States Attorney. Statements such as these by the government in closing argument are reprehensible, whether intentional or inadvertent[1]; if uncorrected by the court or the prosecutor, they would raise serious doubt as to the fairness of the trial. Here, however, upon proper objection by defense counsel, the court on each occasion instructed the Assistant United States Attorney to correct her misstatement, which she did. Under the particular facts of this case, we believe that the net effect of the misstatements, the interruptions for objections, and the corrections by the government, was to emphasize the weaknesses in the government's identification evidence and not to prejudice the rights of appellant.

■ Appellant further contends that the trial court erred in denying his motion for a mistrial when the government, in rebuttal closing argument, told the jury that appellant was a fugitive. The remark was made in response to closing argument for appellant in which defense counsel challenged the signature of "John Goodwin" on certain receipts from Nassau Yacht Haven that had been introduced as evidence by the government:

I am sure the Government could have gotten experts and they could have gotten specimens of signature . . . . They could have gotten this man's signature. And they could

---

1. We find the misstatement of Delise's description of Goodwin's height particularly objectionable in view of the Assistant U. S. Attorney's comment immediately thereafter,

that "[y]ou can change your beard and you can change your long hair, but you can't change your height."

have had an expert come in and say, "That signature is the same person that wrote this." But did they tell you that? No. (Transcript, pp. 169–70)

The government objected to this line of argument, but the court overruled the objection. The Assistant United States Attorney responded on rebuttal:

Now, defense counsel made a big point about the fact that if we really wanted to build a good case we could have compared the signature that the defendant signed with the signature of John Goodwin on the receipt for the fuel on the boat MARIA. But from the time that this indictment was returned until the arrest warrant was issued, he was a fugitive and he was a fugitive out of this country and remained out of the country until he was arrested. We were unable to obtain the signature of the defendant. (Transcript, pp. 172–73)

Counsel for Goodwin objected to the reference to appellant as a "fugitive" on the grounds that no such showing had been made and that "the word 'fugitive' essentially to lay people has a bad meaning." The objection was overruled.

We agree that the government's rebuttal argument was inflammatory and excessive. Appellant's fugitive status was neither relevant nor material to the issues being determined by the jury. More important, characterization of appellant as a fugitive was unsupported by any evidence in the record. The Third Circuit considered a similar characterization and observed that "the prosecutor's representation in his closing argument, unsupported by any evidence in the record, that appellant had been a 'fugitive for six weeks in California once he knew he was wanted for bank robbery' was clearly error and was prejudicial to the defense." *United States v. Small,* 3 Cir. 1971, 443 F.2d 497, 500.

We find the Third Circuit's conclusion compelling here.

The government's rebuttal, of course, was not delivered in a vacuum or in an entirely gratuitous manner. It was made in response to a not totally unprovocative argument by appellant, and it must be evaluated in that light.

As an advocate [a United States Attorney] is permitted to make a fair response to defense arguments. The doctrine does not, however, give him what the First Circuit has described as "a hunting license exempt from ethical constraints on advocacy." *Patriarca v. United States,* 402 F.2d 314 (1st Cir., 1961). He is at liberty to strike hard blows, but not foul ones.

*United States v. Bursten,* 5 Cir. 1971, 453 F.2d 605, 610–611, cert. denied, 1972, 409 U.S. 843, 93 S.Ct. 44, 34 L. Ed.2d 83. We are convinced that in this case the government's assertion was beyond the boundaries of permissibly "hard blows," and that zeal was permitted to outrun fairness.[2]

In *Hall v. United States,* 5 Cir. 1969, 419 F.2d 582, we held that the prosecutor's description of the accused as a "hoodlum" was improper, and that even in the absence of objection from defense counsel, the trial court should have instructed the jury to ignore the remark. The rationale for that part of our decision in *Hall* would apply with at least as much force to the use of the term "fugitive" in the present case:

This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises —succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

419 F.2d at 587.[3]

---

2. *See* Handford v. United States, 5 Cir. 1957, 249 F.2d 295, 296, in which this Court succinctly stated the heavy obligation of fairness a United States Attorney bears in a criminal prosecution.

3. The term "fugitive" may be even more prejudicial than the term "hoodlum" because it is a more specific characterization and more likely to be interpreted as a legal conclusion based on particular facts. *See* McMillian v. United States, 5 Cir. 1966, 363 F.2d 165.

**1148**

In certain cases we have declined to reverse convictions because of inflammatory prosecutorial statements when no objection was made at trial, United States v. Jenkins, 5 Cir. 1971, 442 F.2d 429, 435, or when the trial court promptly and specifically instructed the jury that the remarks were improper and not to be considered, United States v. Crane, 5 Cir. 1971, 445 F.2d 509, 520; United States v. Martinez, 5 Cir. 1972, 466 F.2d 679, 683. In the case *sub judice*, however, defense counsel made timely objection, and the trial court gave no cautionary instruction. The government's characterization of appellant as a fugitive was the last thing the jury heard before the court's general charge. At the very least, upon counsel's objection the court should have instructed the jury, forcefully and unequivocally, that no evidence had been introduced to establish that appellant was a fugitive and that the prosecutor's comment should be disregarded.

### IV.

Goodwin's final contention is that the trial court erred in permitting government agents to testify regarding appellant's arrest while apparently committing an offense similar to the one charged in the present case. As its last witnesses in the trial the government called Customs Agents George Thurman and Michael Brom. Both agents testified to their participation in the arrest of appellant on November 30, 1972, and over strenuous objection by defense counsel, described the seizure of approximately 3000 pounds of marijuana on that occasion. Agent Brom further testified that he had performed a field test on the seized substance and reported, again over defense objection, that the test yielded a positive reaction indicating marijuana. At the conclusion of Agent Brom's testimony the court instructed the jury that it was to consider the testimony of the arresting agents "solely for the purpose of going to willfulness and intent." [4] At this point appellant moved for a mistrial, and the court denied the motion.

The federal courts have established as a "universal rule" the wise principle that "evidence of the commission of a wholly separate and independent crime is not admissible as a part of the case against the defendant." 2 C. Wright, Federal Practice and Procedure, Criminal § 410, at 123. The reason for the rule is, of course, that an accused's guilt or innocence as to a particular crime should be determined solely on the basis of evidence relevant to that crime; a jury should not be permitted to convict an accused because it believes him to be a person of bad character or because of a notion that, since he committed some other similar crime, he must also have committed the crime for which he is on trial. The wisdom and justice of the rule are unchallenged. Nevertheless,

---

4. The full text of the court's preliminary charge follows:

THE COURT: Ladies and gentlemen of the jury, I want to give you a preliminary charge with respect to the testimony of the last two witnesses.

Their testimony has been to the effect that Mr. Goodwin was engaged in substantially similar conduct to the one for which he is now on trial. That evidence was admitted by me solely for your consideration of whether it tends to show whether Mr. Goodwin willfully intended to commit the offense with which he is charged and is now being tried; or to show that he had a design or scheme to commit crimes of the sort with which he is charged.

You are not required to consider this evidence—and whether you do or not is solely a matter within your exclusive province. You may not consider it as tending to show in any other respect Mr. Goodwin's guilt of the offense with which he is now charged.

I will charge you later, among other things, that willfulness or intent is an essential element of this offense. So this evidence was admitted solely for your consideration going to intent. It is not evidence of any kind whatsoever that Mr. Goodwin did commit the crime for which he is now being tried. It is admitted solely for the purpose of going to willfulness and intent.

Does everybody understand that?

[The jury indicates in the affirmative.]

THE COURT: It is admitted solely for the purpose of going to willfulness and intent. (Transcript, pp. 138–39)

courts have proceeded to carve out a number of exceptions to the "universal rule," admitting evidence of other crimes to prove some elements of the crime for which the defendant is being tried.[5] For the purposes of our review of this case, three generally recognized exceptions to the rule are arguably relevant—intent, design or plan, and identity.[6] We shall consider each of these exceptions in order.

Both the government, at trial and on appeal, and the district court placed primary reliance on "intent" as a basis for admitting evidence of the subsequent offense. The Assistant United States Attorney urged only the intent exception at trial, and the court, in its preliminary charge to the jury following the testimony of Agents Thurman and Brom, purported to limit the jury's consideration of the evidence to that issue.[7] In this appeal, both in its brief and at oral argument, the government continued to rely solely on intent.

Undeniably, intent is an element of the crimes of importing marijuana into the United States and conspiring to import marijuana into the United States.[8]

---

5. Professor Wigmore has described the most common avenues for entering evidence of other crimes as:

> *Capacity* (physical strength or the like): on a charge of placing a large stone on a railroad track, the previous felonious placing of a rail on the track shows the defendant's strength-capacity for the act;
>
> *Habit* or *Custom:* to show a habit of omitting a signal at a railroad-crossing, previous instances of its omission are relevant;
>
> *Design* or *Plan:* to show a plan to rob a safe, the stealing of the key would be relevant; or to show a plan to murder a whole family and obtain their insurance-money, the killings of other insured members of the family would be admissible;
>
> *Knowledge* or *Belief:* to show knowledge of the conterfeit quality of a bank-bill, a former unsuccessful attempt to pass a similar one is relevant;
>
> *Intent:* to show intentional falsification of accounts, former incorrect entries of a similar sort tend to negative mistake;
>
> *Motive:* to show a probable desire in a husband to get rid of his wife, an adulterous relation with another woman is relevant;
>
> *Identity:* to assist in identifying a murderer, the commission of another murder by the defendant is relevant, if it appears that the same person committed both.

1 J. Wigmore, Evidence § 217, at 718–19 (3d ed. 1940). Professor Wigmore described *res gestae*, including "other criminal acts which are an inseparable part of the whole deed," as still another type of admissible evidence. *Id.* § 217, at 719. The exceptions have become so numerous that, as Professor Wright has observed, "the attitude of prosecuting attorneys may well be like that of the man who was asked what he thought of Prohibition and replied: 'It sure beats not drinking at all.'" 2 C. Wright, *supra*, at 125 n. 75.

6. Each of these rationales was stated by the district court at some time during the trial.

The court went further at a proceeding on a post-trial motion, asserting that "the evidence was admissible for the limited purpose it was admitted: for intent, motive, knowledge, common plan, or scheme." (Supplemental Transcript, p. 5). Neither "motive" nor "knowledge," however, was advanced at any point during the trial as justification for admitting the evidence, and the jury was never instructed that it could consider proof of the subsequent offense to establish either of those elements of the crime charged.

7. *See* footnote 4, *supra*. The court used the phrase "willfulness and intent," but apparently considered the terms synonymous. We have found no cases supporting an exception to the exclusionary rule for "willfulness," except as it is used to show intent. *See* Roe v. United States, 5 Cir. 1963, 316 F.2d 617, 621, n. 9.

8. As opposed to former 21 U.S.C. § 176a, the statute under which importation of marijuana was prosecuted prior to the effective date of the 1970 Drug Abuse Prevention and Control Act, the present 21 U.S.C. § 952(a) does not explicitly set forth an independent requirement of knowledge or intent. But § 952(a) must be read with the penalty provisions in 21 U.S.C. § 960 as requiring knowledge and intent before any punishment can be imposed. Courts have assumed, of course, that such a requirement does exist. *See, e. g.,* United States v. LaFroscia, 2 Cir. 1973, 485 F.2d 457. In the present case, the indictment charged that the defendants "did *knowingly and intentionally* combine, conspire, confederate, and agree . . ." and that Goodwin "did *knowingly and intentionally* import . . . ." (emphasis added). The district court instructed the jury that the essential elements of the importation offense were: "(1) The act of *knowingly or intentionally* importing (2) a controlled substance in Schedule I (3) into the United States from any place outside thereof." (Transcript, p. 191, emphasis

It is equally clear that the Fifth Circuit has long recognized, as an exception to the rule against admitting evidence of other crimes, that, in some instances,

> evidence of other offenses by the accused is admissible to show his criminal intent as to the offense charged, where the other offenses are similar to and not too remote from that charged, and where intent is in issue as an element of the offense charged.

Weiss v. United States, 5 Cir. 1941, 122 F.2d 675, 682, cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. These facts do not terminate our inquiry, however, because we decline the government's invitation to sanction the admissibility of testimony solely on the mechanical basis that, in name, it fits one of the certified categories.

■ We reject the government's theory, not only out of respect for the law of this Circuit, but also out of a recognition of the danger, enunciated by Dean McCormick, that,

> if the judges, trial and appellate, content themselves with merely determining whether the particular evidence of other crimes does or does not fit in one of the approved classes, they may lose sight of the underlying policy of protecting the accused against unfair prejudice. The policy may evaporate through the interstices of the classification.

C. McCormick, Evidence § 190, at 453 (2d ed. 1954). Rather than undertake an exercise in "pigeonholing," as Dean McCormick describes it, this Court has adopted a more difficult, but more enlightened, balancing approach. Assuming, of course, that the evidence of other crimes is clear and convincing, we must balance the actual need for that evidence in view of the contested issues and the other evidence available to the prosecution, and the strength of the evidence in

proving the issue, against the danger that the jury will be inflamed by the evidence to decide that because the accused was the perpetrator of the other crimes, he probably committed the crime for which he is on trial as well.

■ We emphasize that the test we set forth today is by no means a novel one in this Circuit. In United States v. Boyd, 5 Cir. 1971, 446 F.2d 1267, 1270–1271, we stated:

> The list of exceptions to the other crime evidence rule is extensive, and in most situations evidence of other crimes—if closely connected in time and nature to the offense charged—can fit within at least one of the exceptions. But the mere categorizing of the evidence should not overshadow the rationale of the rule. It has been stated that the admissibility of such evidence is not to be determined entirely by its relevancy and its categorization, but that there must also be a balancing of the need for the evidence against the possible prejudice to the accused.

More specifically, with regard to the question of the prosecution's actual need for the evidence, this Court has held that

> other crime evidence may be received only if the element of the offense which the evidence is introduced to establish is contested . . . and is not established by other uncontroverted evidence relating to the principal offense . . . .

United States v. Broadway, 5 Cir. 1973, 477 F.2d 991, 994. Implicit in the *Broadway* language is the corollary principle that the other-crimes evidence may be received only if it has legitimate probative value in establishing the element of the offense for which it is offered. In United States v. Lawrance, 5 Cir. 1973, 480 F.2d 688, we gave our regards

---

added). As to the conspiracy offense, the court charged the jury that to find Goodwin guilty it must find that he "willfully partici-

pated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy." (Transcript, p. 186).

to *Broadway* in unmistakable language,[9] and we do so again today. Earlier, in Hamilton v. United States, 5 Cir. 1969, 409 F.2d 928, we gave special emphasis to these principles as applied to the intent exception. We held that other-crimes evidence is admissible on the issue of intent only *"where intent, as such, is a critical ingredient of the offense charged."* 409 F.2d at 930 (emphasis in original).

The decisions of this Circuit cited in the government's brief do not lead us to a contrary result; rather they are entirely consistent with the law as stated in *Hamilton, Boyd, Broadway,* and *Lawrance.* The government relies heavily on Weiss v. United States, *supra,* the case in which the principle that evidence of similar offenses may be admissible to prove intent is believed to have had its genesis in the Fifth Circuit. This Court, however, went no further in *Weiss* than to say that such evidence is admissible "where intent is *in issue* as an element of the offense charged," 122 F.2d at 682; the limited nature of that language is amply illustrated by the posture of the issues in the case:

> With the issue thus sharply drawn as to Weiss' guilty intent, the trial court permitted the district attorney to introduce evidence of Weiss' participation in other frauds against the state in which he claimed to have been the innocent instrument of the true criminal.

122 F.2d at 681–682. In Roe v. United States, 5 Cir. 1963, 316 F.2d 617, another case relied upon by the government, the question of whether the acts constituting the crime were performed "willfully," i. e., intentionally (see footnote 7, *supra*), was not only contested, but was probably the most vigorously disputed issue in the trial. Finally, in United States v. Johnson, 5 Cir. 1972, 453 F.2d 1195, this Court specifically rejected the notion that evidence was admissible simply because it could be made to fit in the "specific intent or knowledge" category. Rather, relying on our decision in United States v. Stallings, 5 Cir. 1971, 437 F.2d 1057, the Court balanced "the prejudicial effect of this evidence" against "any *proper benefit* the prosecution could derive therefrom," and determined that the conviction must be reversed. 453 F.2d at 1199 (emphasis in original).[10]

■ We turn now to an analysis of the issues in the trial of John Goodwin

---

9. Writing for the panel, Judge Godbold declared:

> Relevance alone is not the key to this prosecutorial Pandora's box. If the evidence is relevant to an element of the offense which is in issue the trial court must then evaluate the evidence to determine whether it is "plain, clear, and conclusive" that the defendant did in fact commit the other crimes. United States v. Broadway, 477 F.2d 991 (CA5, 1973). Assuming the evidence of extrinsic crimes is convincing and relevant to a material fact in issue the trial court must then weigh the probative value of the evidence against its inherent prejudicial effect. On those scales the court must also weigh the need for such probative evidence, i. e., if the prosecution has a strong case without the evidence of similar criminal acts then there is no need for the probative value of the evidence and it should be excluded.

480 F.2d at 691–692 n. 6. This Court has recently noted the limited nature of another of the *Broadway* principles, United States v. Bryant, 5 Cir. 1974, 490 F.2d 1372; we have not retreated a single step, however, from the important rule quoted in the text and reemphasized in *Lawrance.*

10. The remaining Fifth Circuit cases cited by the government, United States v. Alston, 5 Cir. 1972, 460 F.2d 48, cert. denied, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122, and United States v. Apollo, 5 Cir. 1973, 476 F.2d 156, are inapposite to the question of admissibility of other-crimes evidence to prove intent. In *Alston* intent was a factor only to the extent that it added to the very substantial relevancy of the other-offense testimony to show "similarity of method." The evidence there consisted of telephone calls between Alston and an undercover agent in which, as in the crime for which Alston was being tried, a previously arranged cipher and the same code words were used. In *Apollo* the government's claim was that the evidence should be admitted to show a pattern or scheme; in any event, the Court relied on United States v. Johnson, *supra,* and held that the other-crime evidence was improperly admitted.

in light of the requirements set forth above. We have noted that, when appellant was apprehended on November 30, 1972, he was in the water in the immediate proximity of a vessel containing some 3000 pounds of marijuana; appellant does not dispute that the other-crime evidence was clear and convincing as to the conduct described. It is thus appropriate in this case to balance the prosecution's actual need for this evidence to show intent and the strength of the evidence as proof of intent against the danger that the jury would conclude that, because appellant was caught on November 30th, apparently bringing 3000 pounds of marijuana into the United States, he must have been the one who captained the ship that brought marijuana into the country in February.

The facts of this case tip the scales heavily against the government. Although intent was an element of the crimes charged, that issue was never seriously disputed at trial. Appellant's entire defense was based on the argument that he was not the John Goodwin whom government witnesses had implicated in the conspiracy. Moreover, undisputed evidence, introduced prior to the testimony of Agents Thurman and Brom regarding the November 30th arrest, indicated that one John Goodwin had participated in discussions about the importation of marijuana and had helped load the marijuana onto the MARIA. If appellant was the John Goodwin described by government witnesses, there could have been no reasonable doubt as to intent, willfulness, or knowledge. This is similar to the situation confronted by this Court in Fallen v. United States, 5 Cir. 1955, 220 F.2d 946, cert. denied, 350 U.S. 924, 76 S.Ct. 213, 100 L.Ed. 808, an automobile theft case, in which we stated:

> We think that there could have been no real question of Trice's criminal motive if, in fact, he changed the numbers on the stolen automobile. Proof of the commission of the act carried with it the evident implication of a criminal intent. In such instances, evidence of the perpetration of other like offenses is not needed to establish criminal motive or intent and is not admissible for such purpose.

220 F.2d at 948.

Balanced against the total absence of need for the evidence of appellant Goodwin's subsequent conduct to show intent, this case poses a dramatic example of the kind of prejudice the rule against admitting other-crime evidence was designed to prevent. On the basis of the uncertain in-court identifications by witnesses Ritsema and Delise, the jurors may well have entertained a reasonable doubt as to whether appellant was the John Goodwin involved in the crimes charged in the March 16, 1972 indictment. The testimony linking appellant John Goodwin to 3000 pounds of marijuana on November 30, 1972, might well have removed—by impermissible inference—any such doubt. We conclude that the district court erred in admitting this evidence for the purpose of proving intent.

The second rationale arguably used by the district court for admitting the other-crime evidence was to prove a design or plan. The district court in its preliminary charge to the jury twice said that the evidence was admitted *solely* for consideration as to the issue of intent; on one occasion during the same instruction, however, the court told the jurors that they might also consider the evidence "to show that [appellant] had a design or scheme to commit crimes of the sort with which he is charged." *See* footnote 4, *supra*. Even if this charge on "design or scheme" were correct, we would question its efficacy in view of the contradictory nature of the preliminary charge as a whole. The charge, however, was entirely *incorrect*. As an exception to the general rule against admitting other-crimes evidence courts have permitted the introduction of such evidence to show a design or scheme on the part of the accused to commit *the specific crime* with which he is charged, but never to show a design or scheme to

commit *"crimes of the sort* with which he is charged."

When the prosecution seeks to prove design or plan by the doing of similar acts, more is required than the mere similarity that may suffice for showing intent. As Professor Wigmore has explained:

The added element, then, must be, not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations*. Thus, where the act of passing counterfeit money is conceded, and the intent alone is in issue, the fact of two previous utterings in the same month might well tend to negative intent; but where the very act of uttering is disputed— as, where the defendant claims that his identity has been mistaken—, and the object is to show that he had a general system or plan of working off a quantity of counterfeit money and did carry it out in this instance, the fact of two previous utterings may be in itself of trifling and inadequate significance.[11]

The "design or scheme" exception is totally inappropriate in the case *sub judice*. Though evidence of importation of marijuana in November 1972 might be of value in showing that the commission of such an act in February 1972 was not unintentional—if intent were in dispute —that evidence contributes nothing toward proving any plan or scheme to import marijuana in February 1972.

We turn finally to the exception to the exclusionary rule by which courts admit other-crimes evidence to prove identity. We note first that the trial court never instructed the jury that it could consider evidence of the subsequent offense to establish identity; we further observe that the government does not contend on this appeal that the evidence could prop-

erly have been admitted for this purpose. We discuss the issue here only because the transcript reveals a misunderstanding of the exception by the district court prior to the time the court issued its preliminary charge to the jury; such a misunderstanding should not serve as a justification for admitting evidence of appellant's November 30th conduct once again if the government chooses to retry Goodwin for the crimes charged in the March 16, 1972 indictment.

Prior to the testimony of Agents Thurman and Brom, the Assistant United States Attorney made a proffer of the evidence she expected to adduce from those witnesses. The court overruled defense counsel's objections to that evidence. The following exchange then took place, outside the presence of the jury, between defense counsel and the court:

MR. JONES [counsel for Goodwin]: Then, consistent with your ruling, it is for the willfulness and intent as to these next officers testifying?

THE COURT: No, sir. Willfulness and intent and, in my opinion, as to the question of identity. There seems to be some question as to the identity of this defendant, since Mr. Delise gave such an excellent description which was at odds with the actual appearance.

And since Mr. Ritsema said that at the time he knew him he had longer hair and a mustache and that he was reasonably sure that it was this defendant, I think it is relevant and material, also, with respect to the question of identity. (Transcript, p. 127).

The facts of this case, however, do not pose the proper situation for the identity exception. If the exception were used as the district court implied it could be, the effect would be to drain all remaining life from the general rule against admission of other-crimes evidence.

---

11. 2 J. Wigmore, Evidence § 304, at 202–03 (emphasis in original). For examples of appropriate evidence to prove design or plan,

see the excerpt from Professor Wigmore's treatise quoted in footnote 5, *supra.*

The only value that evidence of appellant's conduct on November 30th would have in establishing "identity" would be to plant in the minds of the jurors the notion that, because appellant is the kind of person who is associated with vessels containing large quantities of marijuana, he must have been involved in the importation and conspiracy with which he was charged in the March 16th indictment. This simply is not a permissible use of other-crimes evidence under the law.

■■■■ The "identity" exception has a much more limited scope; it is used either in conjunction with some other basis for admissibility [12] or synonymously with *modus operandi*. A prior or subsequent crime or other incident is not admissible for this purpose merely because it is similar, but only if it bears such a high degree of similarity as to mark it as the handiwork of the accused. For example, in United States v. Jackson, 5 Cir. 1971, 451 F.2d 259, this Court upheld the district court's admission of evidence regarding another unlawful incident on the same day to prove identity, where both acts were committed by a man of similar description who presented an identification card bearing the same social security number and apparently valid pay orders originating from Fort Ord, California, and who represented himself to be Charles T. Jackson. The trial court in *Jackson* instructed the jury that the evidence was admitted for the specific limited purpose of showing *modus operandi*, which

might "shed some light on the identity" of the defendant, and explained that,

> sometimes in criminal offenses, one's method of doing things, of painting a portrait or of laying fancy brickwork or of committing a crime, the methods and artistry involved are so similar that you can almost say from looking at two of them that the same hand did both of them.

> In other words, similarity of method, similarity of mode of operation is sometimes almost like a trademark of its author.

451 F.2d at 263 n. 6 (quoting from Judge Edenfield's statement to the jury at Jackson's trial). In the case *sub judice* appellant's conduct on November 30, 1972, as described by Agents Thurman and Brom—standing in the water about 500 yards off the coast of Key Largo and about 40 yards from an unnamed boat containing 3000 pounds of marijuana—and the relevant conduct of February 1972, as charged at trial—bringing either 1000 pounds (as stated in the indictment) or 3000 pounds (as argued by the government) of marijuana into Pompano Beach aboard the ship MARIA—do not bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual.[13] Thus, as with the "design or scheme" issue discussed above, even if the other-crime evidence had been introduced to establish identity, which it was not, and even if the trial court had so instructed the jury, which it did not, the evidence would not have been admissible because it would have had no legally-recognized

---

12. *See* United States v. Jackson, 5 Cir. 1971, 451 F.2d 259. According to Dean McCormick, "a need for proving identity is not ordinarily of itself a ticket of admission, but [such] evidence will usually follow, as an intermediate channel, some one or more of the other theories," generally plan, *modus operandi*, or motive. C. McCormick, Evidence § 190, at 451 (2d ed. 1954).

13. *Compare* Drew v. United States, 1964, 118 U.S.App.D.C. 11, 331 F.2d 85 (evidence of other crime *not* admissible; both crimes committed against High's neighborhood stores on

summer afternoons, two and one-half weeks apart, by a Negro male wearing sunglasses; in each instance a sales clerk at the victimized store identified defendant Drew as the offender), *with* Parker v. United States, 9 Cir. 1968, 400 F.2d 248 (evidence of other crimes admissible; in each of the crimes the robber posed as a hitch-hiker, kidnapped the driver who offered him a ride, forced the hostage at gunpoint to drive him to and accompany him into a bank, and directed the hostage to fill a pillow case provided by the robber with money from the tellers' cages).

strength in proving the matter for which it was introduced.

That courts must guard against improper incursions on the general rule against admitting other-crimes evidence is so critically important, of course, not because such evidence has no probative value, but for the very reason that such evidence may have very substantial strength—not cognizable in law—in establishing a defendant's identity in the minds of the jurors.[14] This Court has never hesitated to approve the admission of other-crimes evidence when that evidence has been relevant under one of the exceptions to the general rule. We have recognized, however, and we must continue to recognize, that the various categories of exceptions—intent, design or plan, identity, etc.—are not magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names. To the contrary, each exception has been carefully carved out of the general rule to serve a limited judicial and prosecutorial purpose. We believe that in the present case evidence of appellant's apparent possession or importation of marijuana near Key Largo on November 30, 1972, could serve no proper judicial or prosecutorial function that would outweigh its prejudicial effect. The district court erred in permitting the jury to consider that evidence, whether for the instructed purpose of proving intent, for the partially instructed purpose of showing design or scheme, or for the uninstructed purpose of establishing identity.

Reversed and remanded.

14. This danger was eloquently illustrated by Judge Ladd of New Hampshire almost one hundred years ago:

"But it is nevertheless argued on behalf of the State (if I have not wholly misapprehended the drift of the argument) that the evidence was admitted because, as a matter of fact, its natural tendency was to produce conviction in the mind that the prisoner committed rape upon his victim at the time he took her life. . . . I shall not undertake to deny this. If I know a man has broken into my house and stolen my goods, I am for that reason more ready to believe him guilty of breaking into my neighbor's house and committing the same crime there. We do not trust our property with a notorious thief. We cannot help suspecting a man of evil life and infamous character sooner than one who is known to be free from every taint of dishonesty or crime. We naturally recoil with fear and loathing from a known murderer, and watch his conduct as we would the motions of a beast of prey. When the community is startled by the commission of some great crime, our first search for the perpetrator is naturally directed, not among those who have hitherto lived blameless lives, but among those whose conduct has been such as to create the belief that they have the depravity of heart to do the deed. This is human nature—the teaching of human experience. If it were the law, that everything which has a natural tendency to lead the mind towards a conclusion that a person charged with crime is guilty must be admitted in evidence against him on the trial of that charge, the argument for the State would doubtless be hard to answer. If I know a man has once been false, I cannot after that believe in his truth as I did before. If I know he has committed the crime of perjury once, I more readily believe he will commit the same awful crime again, and I cannot accord the same trust and confidence to his statements under oath that I otherwise should. . . . Suppose the general character of one charged with crime is infamous and degraded to the last degree; that his life has been nothing but a succession of crimes of the most atrocious and revolting sort: does not the knowledge of all this inevitably carry the mind in the direction of a conclusion that he has added the particular crime for which he is being tried to the list of those who have gone before? Why, then, should not the prosecutor be permitted to show facts which tend so naturally to produce a conviction of his guilt? The answer to all these questions is plain and decisive: The law is otherwise."
State v. Lapage, 1876, 57 N.H. 245, 275, 299, *quoted in* 1 J. Wigmore, Evidence § 193, at 643–44 (3d ed. 1940).