**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Howard Long PARK, Jr., Defendant-Appellant.**

No. 75–1167.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1976.

Neal R. Sonnett, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

Defendant Howard Long Park, Jr., appeals from his conviction for violating 18 U.S.C. § 659, which proscribes, *inter alia,* possession of goods stolen from an interstate or foreign shipment. He assigns as error on appeal the admission at trial of evidence obtained through a warrantless search of his automobile, and the prosecutor's cross-examination of defense witnesses. We reverse on the latter point, and therefore need not and do not reach the issues raised by the search and seizure.[1]

On Sunday, April 7, 1974, customs patrol officers on Dodge Island in Miami observed "an apparent pilferage" from the crib cage in Shed B, a storage area.[2] The officers drove around the wharves and warehouses and noted all vehicles parked in the area. They then proceeded to the guardhouse that covered the bonded area and began to inspect these vehicles as they left Dodge Island. Defendant Park was an employee of Marine Terminals, Inc., and worked on Dodge Island. His car had been observed at Shed D, but because a vehicle

---

1. The parties contest whether the search involved should properly be governed by rules applicable to "border searches," and, in any event, whether it was constitutionally permissible.

2. The crib cage contained expensive and portable items, such as radios, calculators, liquor, and food, but did not contain any television sets.

at that location would have access to Shed B, Park was stopped at the guardhouse. He complied with a request to open his trunk, whereupon the officer discovered a color television set in a plastic bag and brown wrapping inside a packing crate. Also inside the wrapping were a blank warranty, UHF antenna, and an operating manual. When questioned about the set, Park stated that it had been a gift from his wife and that he had had it for about three months. The officer noted the serial number and Park departed with the set.

On the following day, an FBI agent, after advising Park of his rights, questioned him about the television. Park told the agent that he had borrowed it from a man named Charlie, whom he had heard about from a friend but had not previously met, and that he had taken it to Dodge Island to watch a baseball game because there had been little work to do. On the same day, the FBI agent found the television set in an open carton in a crib cage in Shed D, the Marine Terminals warehouse. Documentary evidence introduced by the government established that the television observed in Park's trunk and subsequently found in the warehouse was one of a shipment sent from Batavia, New York, en route to Panama; the shipment arrived in Miami intact on April 1, 1974.

The defense called two witnesses, Leon James, foreman of Marine Terminals, and George Wagner, the company's general manager. On direct examination, Mr. James briefly related his duties as foreman and those of Park as a checker; described the crib area of Shed D; and stated that on April 7 he had seen Park, upon arriving at work, remove from his trunk a portable television wrapped in plastic. He testified that Park often watched baseball games on slow days, and that he observed Park watching television on the day in question. On cross-examination, the prosecutor elicited the fact that Park had been watching a black-and-white television. After some general questions concerning union representation of Marine Terminals' employees, the focus of the questioning shifted abruptly:

Q. And you have worked with Mr. Park for how long?

A. About six and a half years.

Q. Had you worked with Mr. Park last August, 1973?

A. That Sunday?

Q. In August, 1973?

A. August?

Mr. Schwartz [defense counsel]: At this point I object. I don't see any relevancy to August, 1973. We are talking about a situation—

The Court: I don't want any argument. The objection is overruled.

A. You said August, 1973?

By Mr. Ennis [prosecutor]:

Q. Yes.

A. Yes, it should be, because I was working for six and a half years.

Q. So you were working—

A. I was working with him in August 1973? Yes.

Q. Did you ever have occasion to see Mr. Park take anything from Shed D, at the warehouse?

A. No.

Q. You never saw him bring anything from the warehouse that didn't belong to him?

A. No, sir.

Q. You never saw anything go out of the warehouse that didn't belong to him?

A. No, sir.

Q. In August, 1973, you didn't see Mr.—do you know a Eugene Seitlin?

A. No, not to my knowledge.

Q. Does that name mean anything to you?

A. No, sir.

Q. Does driving a pilot truck in 1973 mean anything to you?

A. Pilot truck?

Q. Yes.

A. No.

Q. Did you see a Mr. Jack Silvia in August, 1973?

A. Did I see him in 1973?

Q. Yes.

A. He used to work on the island.

Q. Did you ever see anybody take anything from Shed C to Shed D?

A. What do you mean?

Q. Anything from Shed C to Shed D?

Mr. Schwartz: Once again, I am going to object to this form of questioning as improper.

The Court: The objection is overruled.

A. Take it from Shed C to Shed D?

By Mr. Ennis:

Q. Right?

A. No, sir.

Q. You never saw?

A. Like what?

Q. Anything. Did you ever see anything taken from Shed C to Shed D that didn't belong to him?

A. No.

Q. You never saw Mr. Silvia take anything from Shed C to Shed D that didn't belong to him?

A. No.

Q. You never met Mr. Silvia in August, 1973?

A. I never met him.

Q. You never met with him as far as taking things from Shed C to Shed D?

A. No, sir. I've got a lot to do. Like I go from one shed to the other.

Q. Were there any dock receipts for 85 air conditioners on August, 1973—

Mr. Schwartz: Once again, I will object.

The Court: Overruled.

By Mr. Ennis:

Q. Do you know anything about 85 air conditioners in August, 1973?

A. No, sir.

Q. You didn't see Mr. Silvia and Mr. Seitlin in August, 1973?

A. No, sir.

As suddenly as he had initiated it, the prosecutor dropped the preceding line of questioning. After further inquiry concerning the television, and company procedure involving keys to the crib cage, James was dismissed and the defense called the Marine Terminals general manager, Wagner.

On direct examination, Wagner testified that no televisions from the Batavia-Panama shipment had been reported missing, and all were in fact accounted for on April 8. He also described the crib area, identified the individuals who had keys to the area, and described procedures for safe-guarding the keys. Wagner explained that occasionally cartons of goods arrive at the dock already opened. He further stated that the company condoned games, televisions, and similar diversions on weekends when there was little work.

The prosecutor began his cross-examination of Wagner with questions concerning the use of televisions at work, keys to the crib cage, and unions. Then, abruptly, the following colloquy occurred:

Q. Have you ever had Mr. Park do anything for you that was not attributable to the company?

Mr. Schwartz: Objection, your Honor.

The Court: I am going to overrule the objection.

A. Will you repeat that?

By Mr. Ennis:

Q. Did you ever have Mr. Parks [sic] do anything for you that was not connected with Marine Terminals or with off-loading ships?

A. It's possible. I don't know how you phrased that question. Does he go to get my lunch or does he go to get my laundry or something to that effect? No.

Q. Have you ever given Mr. Park an envelope with money in it?

A. Have I ever?

Q. Yes.

A. No.

Q. In August or September, 1973, you did not give Mr. Park an envelope containing $4,000?

Mr. Schwartz: Objection.

The Court: Overruled.

By Mr. Ennis:

Q. Is that correct, sir?

A. No, I did not.

Q. Do you know Jack Silvia?

A. Yes, sir.

Q. Who is he?

A. He had been terminal manager for CCP.

Q. Which is located in Shed C?

A. Which is located in Shed C, yes, I believe.

Q. Shed D received 85 air conditioners in 1973, did it?

A. Not to my knowledge.

Q. You don't know anything about any air conditioners received in July or September, 1973?

A. Well, I don't know just what freight we take in from day to day. We handle about 500 tons of freight a month. I don't know if television sets were taken in that day or air conditioners or washing machines. I would have to look it up.

Q. Would you know about any shipments shipped from Shed C to Shed D?

A. No, I would not.

Q. Normally shipments would not be shipped from Shed C to Shed D, is that true?

A. They could be, yes.

Q. But you would know about them?

A. Not always. Freight is released from one shed to the other, from one company to the other. That is done to make a deadline on a ship. I don't always know about it, no.

The cross-examination ended at this point.

■ From the foregoing it is apparent that the prosecutor's cross-examination of witnesses James and Wagner was not only beyond the scope of direct examination, it was also irrelevant to the issues before the court, improper, and highly prejudicial. Federal courts follow the restrictive rule of cross-examination, which Justice Story, in the context of a civil case, called "well established" as long ago as 1840:

> "[A] party has no right to cross-examine any witness except as to facts and circumstances connected with the matter stated in his direct examination. If he wishes to examine him to other matters, he must do so by making the witness his own, and calling him, as such, in the subsequent progress of the cause." [3]

*Philadelphia & Trenton R. Co. v. Stimpson,* 14 Pet. (39 U.S.) 448, 461, 10 L.Ed. 535, 542 (1840). It is settled that the rule applies to criminal defendants, *United States v. Dillon,* 436 F.2d 1093 (5th Cir. 1971), and to other witnesses in a criminal prosecution, *United States v. Grant,* 510 F.2d 137 (5th Cir. 1975); *United States v. Rodriquez,* 509 F.2d 1342 (5th Cir. 1975) (dictum). Clearly, nothing was elicited by defense counsel from either witness that could be viewed as "opening the door" to the line of questioning pursued on cross-examination, and the inquiry was therefore beyond the scope of direct examination.

■ The restrictive rule does not foreclose inquiries designed to impeach a witness, by, for example, attacking his reliability or credibility, *see* 2 C. Wright, Federal Practice and Procedure § 416 at 186 (1969). It is primarily upon this basis that the government seeks to justify its questioning, asserting that the inquiry was proper to show bias or interest and to attack character. The Supreme Court has recently reaffirmed the propriety of cross-examination directed toward possible interest or bias, holding that a criminal defendant's right to a thorough and searching cross-examination is paramount to the state's interest in protect-

---

**3.** In drafting the Federal Rules of Evidence, the Advisory Committee abandoned the restrictive rule and adopted as Rule 611(b) the following:

A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interests of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination.

56 F.R.D. 273. As enacted by Congress, however, Rule 611(b) reads as follows:

Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination. Pub.Law 93–595, 88 Stat. 1936 (Jan. 2, 1975).

ing the anonymity of juvenile offenders. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). *See also Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). This does not alter, however, the well-established rule in this circuit that "a witness may not be impeached by inquiry about specific acts of misconduct not resulting in a conviction." *United States v. Davenport,* 449 F.2d 696, 699–700 (5th Cir. 1971); *Hudson v. United States,* 387 F.2d 331, 332 (5th Cir. 1967); *Roberson v. United States,* 249 F.2d 737, 741–42 (5th Cir. 1957). This rule protects criminal defendants as well as other witnesses, and applies even when the defense offers evidence of good reputation. *United States v. Davenport, supra.* In the instant case, James and Wagner were called as substantive witnesses, and defendant Park's reputation was never placed in issue. *See United States v. Franklin,* 471 F.2d 1299 (5th Cir. 1973); *cf. Michaelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Accordingly, the questioning cannot be supported as an attempt to impeach either the witnesses or Park.[4]

■ The government also asserts that "proof of a prior offense may be admissible against a defendant . . . ." Brief of Appellee at 15. Such proof, however, must come within one of the recognized exceptions to the "universal rule . . . that evidence of the commission of a wholly separate and independent crime is not admissible as a part of the case against the defendant." 2 C. Wright, *supra,* § 410 at 123; *see United States v. Goodwin,* 492 F.2d 1141, 1148–49 (5th Cir. 1974). The exceptions relate in general to evidence tending to prove an element of the crime presently charged; they encompass, *inter alia,* evidence relevant to prove intent, motive, design or plan, identity, or capacity. *See United States v. Goodwin, supra;* 1 J. Wigmore, Evidence § 217 at 718–19 (3d ed. 1940); 2 C. Wright, *supra,* § 410 at 125–26; *see also* Rule 404(b), Federal Rules of Evidence. In the instant case, the government offered no extrinsic proof of other offenses, but asserts that because such evidence would have been admissible, its cross-examination was proper.[5] The only exception raised by the government to support admissibility is the similar crimes exception to prove identity.[6] We find this assertion to be without merit. First, there is no indication in the record that identity was a material issue. Moreover, as we stated in *United States v. Goodwin, supra,* the identity exception is one of very limited scope: "[I]t is used either in conjunction with some other basis for admissibility or synonymously with *modus operandi.* A prior or subsequent crime or other incident is not admissible for this purpose merely because it is similar, but only if it bears such a high degree of similarity as to mark it as the handiwork of the accused." 492 F.2d at 1154. On the facts of this case, the government cannot avail itself of the identity exception, and we find nothing in the record to indicate the applicability of any other exception to the "universal rule" excluding proof of separate offenses.[7]

The impact of the government's cross-examination cannot be gainsaid. Park was charged with possession of a single stolen television set. The injection of

---

**4.** The government's reliance on Rule 608(b), Federal Rules of Evidence, is misplaced. That rule forbids proof by extrinsic evidence of specific acts of conduct, other than criminal convictions, for the purpose of attacking or supporting credibility; it accords the trial court discretion to permit inquiry into such matters on cross-examination "if probative of truthfulness or untruthfulness." The prosecutor's questioning in the instant case was not probative of or directed toward the truthfulness *vel non* of witnesses James and Wagner. Moreover, Park's trial occurred prior to the effective date of the Federal Rules of Evidence.

**5.** *See* 2 C. Wright, *supra,* § 416 at 190–91; § 410.

**6.** The government concedes that no mental element was in issue, so no evidence of prior offenses could have been offered in an attempt to show intent, motive, or the like. *See Hamilton v. United States,* 409 F.2d 928 (5th Cir. 1969).

**7.** The government's contention that its cross-examination was permissible to place the witnesses in their environment is without merit.

the prosecutor's insinuations of improper conduct involving 85 air conditioners, four thousand dollars in an envelope, pilot trucks, goods moved from one shed to another, and the activities of other individuals whose conduct was not validly related to the guilt *vel non* of appellant, was clearly prejudicial. It necessarily created the impression in the minds of the jurors that both witnesses had been in league with the defendant in prior thefts not charged in the indictment and for which none of the men had been convicted. Moreover, while we do not question the integrity of government counsel in this case, the possibilities of abuse inherent in a rule permitting this type of questioning, where there is nothing to indicate that the incidents about which counsel inquires ever occurred, are obvious.

We conclude that the trial court abused its discretion in permitting this line of inquiry and that Park's conviction must be reversed.

Reversed.