9 F.3d 1551
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Kevin Eugene EDWARDS, Petitioner-Appellant,
v.
Eddie YLST, Respondent-Appellee.
 No. 92-16074.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 11, 1993.
Decided Oct. 22, 1993.
 
 1
 Before: POOLE, BOOCHEVER, and FERNANDEZ, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Kevin Eugene Edwards, a California State prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition, which challenged his jury conviction for two counts of forcible oral copulation of a child under the age of 14 years and more than ten years younger than the defendant and three counts of lewd and lascivious acts upon a child under the age of 14 years, Cal.Penal Code § 288(a), (b).
 
 
 4
 Edwards argues that his trial was rendered fundamentally unfair because (A) the trial court admitted evidence of uncharged sexual crimes committed by Edwards against Kristen M.; (B) Kristen's courtroom photographic identification of Edwards was unduly suggestive; and (C) the prosecutor engaged in misconduct during closing argument by violating the trial court's limiting instruction regarding evidence of Kristen's abuse, arguing for a burden of proof lower than "beyond a reasonable doubt," and arguing that Edwards hired a private investigator to suggest false testimony. We affirm.
 
 
 5
 A. The Admission of Evidence Concerning Kristen's Molestation
 
 
 6
 Under California law, evidence that a person committed a crime or other act is admissible "when relevant to prove some fact (such as ... identity ...) other than his or her disposition to commit such an act." Cal.Evid.Code § 1101(b) (emphasis added). The trial court gave the jury a detailed limiting instruction which explained that the testimony of Kristen and her mother was admitted under section 1101(b) solely to prove identity.
 
 
 7
 The state court of appeals determined that the trial court did not err as a matter of California law. Even so, we have stated: "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir.1991). Due process requires that the admission not be "arbitrary or fundamentally unfair," so that it would deprive the defendant of a fair trial. Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986). In Estelle v. McGuire, --- U.S. ----, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court held that the admission of prior bad acts comports with due process so long as that evidence is relevant to any element of the charged offense. --- U.S. at ----, 112 S.Ct. at 481.
 
 
 8
 The state courts did determine that there were numerous points of similarity which made the molestation of Kristen relevant to identify the molester of Cheryl. We are not able to say that those determinations were so fanciful that the evidence was irrelevant. We do not purport to be experts in the ways of molesters, but overall certain aspects of these acts are strikingly similar. Beyond some of the more obvious similarities--such as the ages of the children and the types of acts performed--are the similarities of manner and timing. The acts were carried out with surprising boldness. In both cases a child was awakened in the night while another child was sleeping in the same room. In neither case was the molester a regular resident of the house or even one who had established a close relationship with the child. Rather the molester was a relative stranger. Yet he was able to awaken his victim without awakening the other child and without alerting the other adults in the home. In one case those other adults were watching television in a room just a few steps away. Thus, the molester was even willing to risk being caught on the spot should the child cry out. However, he managed to keep the child quiet and to perpetrate vile acts upon her. This almost devil-may-care attitude appears to be the mark of a very particular kind of molester. Surely, it suggests that the state courts did not go so far awry as to violate the Constitution.
 
 
 9
 Thus, there could have been no constitutional violation unless Kristen's failure to positively identify Edwards was so complete as to render the evidence of her molestation wholly irrelevant. However, the fact that Kristen's photographic identification was at least tentative, coupled with her mother's unambiguous testimony that it was Edwards who lay in the hallway outside Kristen's door on the night the molestation occurred, gave the trial court a rational basis for finding that the evidence was relevant as to Edwards' identity as Cheryl's molester. Moreover, given that Kristen's testimony about the peculiar behavior of the molester--going out and lying down in the hall--was corroborated by Kristen's mother, there certainly was a basis for the identification.
 
 
 10
 In addition, in this matter, as in McGuire, the instructions made it clear that the prior acts evidence could only be used if the jury first believed the testimony and then only for a strictly limited purpose. The trial court's limiting instruction thus would have tended to counteract any undue prejudice the admission of the prior crimes evidence might have caused. The admission did not "so infuse[ ] the trial with unfairness as to deny due process of law." McGuire, --- U.S. at ----, 112 S.Ct. at 484.
 
 
 11
 B. Admission of Kristen's Photographic Identification
 
 
 12
 There was no constitutional error in connection with the admission of Kristen's photographic identification. "To constitute a due process violation, the photographic identification procedure must be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Denham v. Deeds, 954 F.2d 1501, 1504 (9th Cir.1992) (citing Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)).
 
 
 13
 Edwards does not argue that Kristen's original photographic identification was tainted. Rather, he asserts that Kristen had seen that same photographic spread so many times that her courtroom identification from that spread had been predetermined. That type of claim only makes sense when a witness subsequently points out the suspect himself (rather than his photograph) in court or in a lineup after having been exposed to an unduly suggestive photographic lineup. See, e.g., Simmons, 390 U.S. at 383-84, 88 S.Ct. at 971; People v. Blair, 602 P.2d 738, 750 (Cal.1979) (recognizing the danger of using photographs for identification prior to the corporeal lineup because a witness is apt to retain in his memory the image of the photograph rather than of the person actually seen).
 
 
 14
 However, that problem did not arise in this case. Kristen failed to make a courtroom identification of Edwards. Instead, the state introduced evidence that Kristen could pick Edwards' photograph out of the photographic spread, as well as evidence that she was "pretty sure" of her identification when it was originally made. Edwards had the opportunity to cross examine Kristen and officer Reynolds in order to discredit both her in court photographic identification and her original identification. Of course, Kristen's identification was not the only evidence that pointed to Edwards as the perpetrator of the assault upon her.
 
 
 15
 C. Prosecutorial Misconduct/Closing Argument
 
 
 16
 (1) Prior Conduct--Kristen's Molestation
 
 
 17
 We agree with the magistrate judge and district court that the prosecutor complied with the court's limiting instructions and did not urge the jury to consider evidence of Kristen's molestation to show a propensity to molest little girls. The prosecutor stated that the evidence was relevant to prove Edwards' identity as Cheryl's molester, based on the similarities between the molestations. Moreover, the court immediately instructed the jury that the prosecutor's statements were not evidence. Although that initial cautionary instruction was not particularly forceful, it was sufficient, given the marginal nature of any violation by the prosecutor. See United States v. Johnson, 618 F.2d 60, 62 (9th Cir.1980). More importantly, the trial court's detailed limiting instruction clearly informed the jury not to consider any evidence as showing Edwards' propensity to molest children. See United States v. Olano, --- U.S. ----, 113 S.Ct. 1170, 1781 (1993) (noting the "almost invariable" assumption that jurors follow the court's instructions).
 
 
 18
 (2) Burden of Proof
 
 
 19
 The prosecutor did not argue that the jury should convict on a lower burden of proof in this case. While it may be true that the prosecutor's choice of words was somewhat inflammatory--"if you don't want inconsistencies then don't do a child molest"--, read in context the prosecutor merely stated that child molestation cases by their nature tend to present some inconsistencies. The fact that a child's testimony might contain inconsistencies which a reasonable juror may not overlook in an adult witness, does not mean that the burden of proof is any different. Moreover, the trial court instructed the jury that it could consider inconsistencies. The prosecutor was simply urging caution. Finally, it is uncontested both that the trial court gave a reasonable doubt instruction and that whenever the prosecutor referred to the burden of proof, he accepted the correct standard.
 
 
 20
 (3) Attack on Defense Counsel and Investigator
 
 
 21
 We must consider whether the prosecutor's comments about the defense investigator constituted a violation of Edwards' Sixth Amendment right to counsel under Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir.1983) (per curiam), cert. denied, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984), or whether the comments were an "invited response," and did no more than "right the scale" previously tipped by defense counsel's misconduct. United States v. Young, 470 U.S. 1, 12-13, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985). As the Supreme Court has recently explained, the entitlement to habeas relief depends on
 
 
 22
 whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."
 
 
 23
 Brecht v. Abrahamson, --- U.S. ----, 113 S.Ct. 1170, 1722 (1993) (citations omitted).
 
 
 24
 We hold that defense counsel invited the prosecutor's inappropriate comments. Essentially, Edwards' attorney vouched for his investigator's character and ability based on counsel's personal knowledge. In so doing, he acted inappropriately. See Young, 470 U.S. at 8-9, 105 S.Ct. at 1043 ("Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case"). Edwards' counsel did more than posit a model investigator and imply that Mr. Klingensmith fit the mold. He said that Klingensmith is a "marvelous investigator" who "did what an investigator is supposed to do. He went out and found the facts." No evidence had been introduced as to the proper methods of investigation in child molestation cases or as to Klingensmith's own methodology.
 
 
 25
 In contrast, during the prosecution's redirect examination of Kristen, he established that Klingensmith taped an interview with Kristen. The prosecution then elicited evidence that during the interview it was the investigator who first suggested that her molester had tattoos. Edwards did not object. Thus, in the closing argument, when the prosecutor suggested that Klingensmith planted in Kristen's head the idea that her molester had tattoos, he did have evidentiary support for his statement.
 
 
 26
 Moreover, Bruno is distinguishable. There, the prosecutor did not point to the dangers in suggestive questioning of children. He claimed that an adult was improperly pressured to change her story and to lie on the witness stand. 721 F.2d at 1194 n. 2. He also followed that up with a full blown passion play in which the defense was cast as Judas, betraying the judicial system for "thirty pieces of silver, or the $12,000 given over by the defendant to his counsel." Id. at 1194 n. 3. Thus, in Bruno the prosecutor "openly hint[ed] to the jury that the fact that the accused hired counsel was in some way probative of the defendant's guilt." Id. at 1194.
 
 
 27
 Here, at most, the prosecutor insinuated that the investigator's techniques influenced Kristen's answers, and then accused defense counsel of resorting to a false portrait of Klingensmith in order to deny the allegation. It is clear that the prosecutor's comments were improper to the extent he drew on his experience to argue that defense attorneys hire investigators to help their case and not merely to find facts. Moreover, he should not have implied that defense counsel's suggestion to the contrary was a lie. That sort of language is an unfortunate example of the decline of professionalism and civility that we see all too often. However, missing is the direct allegation found in Bruno--that defendant's counsel was paid to fabricate testimony. It falls far short of the type of argument we found to violate the Sixth Amendment right to counsel.
 
 
 28
 Both counsel improperly went beyond the record to some extent. Edwards' attorney waxed eloquent on the merits and impartiality of the defense investigator. The prosecutor colorfully expressed his doubts on that issue. Neither accused the other of actual wrongdoing. Neither should have drawn on facts outside the record, but they essentially cancelled out each other's hyperbole. While we disapprove of that kind of argumentation, the defendant can hardly complain that his improper sally was met with the riposte in question here. In short, the prosecutor's philippic offset defense counsel's panegyric. We have no doubt that the jury was able to see counsel's comments for what they were--mere heated argument. Viewing the record as a whole, the prosecutor's statements neither caused actual prejudice to Edwards nor rendered the trial fundamentally unfair. See Brecht, --- U.S. at ----, 113 S.Ct. at 1722; McGuire, --- U.S. at ----, 112 S.Ct. at 484.
 
 
 29
 AFFIRMED.
 
 BOOCHEVER, Circuit Judge, dissenting:
 
 30
 This is a difficult case. On the one hand the petitioner, Edwards, has been found guilty of a most serious offense, sexual abuse of a child. On the other, Edwards is serving a seventeen year prison sentence, yet may well be innocent. Our system of justice is designed to balance the concerns of punishing the guilty and protecting the innocent by guaranteeing the accused a fair trial. Edwards did not have a fair trial. First, the district court admitted an uncharged incident of alleged sexual abuse of Kristen M. to show Edwards' identity as the molester of Cheryl F. despite the fact that no distinctive modus operandi was established to connect the alleged incidents. Second, the prosecutor in closing argument unfairly vouched for his view of the case based on his twenty years of personal experience as an attorney and accused the defense attorney of lying. Admitting inadmissible prior act evidence and tolerating the prosecutor's misconduct tainted the highly suspect case against Edwards and deprived him of his constitutional due process right to a fair trial. Conditioned on the granting of a new trial, we should reverse the district court's denial of the habeas corpus writ.
 
 
 31
 I. Admitting Evidence of the Alleged Prior Offense.
 
 
 32
 A. The Alleged Molestation of Cheryl F.
 
 
 33
 Some discussion of the facts is required in order to evaluate whether Edwards' right to a fair trial was violated. Cheryl F. states that she was sexually molested in 1981 when she was six years old. For five years Cheryl did not tell anyone what had allegedly happened to her. In approximately 1986 Cheryl's mother returned from a counselling session for abused women and told Cheryl that the mother had been abused as a child. It was then that Cheryl first mentioned that Edwards had sexually molested her in 1981. It is unclear whether Cheryl made the disclosure before or after her mother had given her a book about child abuse; Cheryl said before, her mother said after.
 
 
 34
 Cheryl testified that she was molested on three separate nights. She said that Edwards shook her awake and threatened to hurt her family if she did not cooperate. Cheryl stated that Edwards pulled her nightgown up and her panties down, touched her vagina with his hand, and tried to copulate her vaginally and anally, finally forcing her to copulate him orally. He committed the same acts on the following night. On the third night, after pursuing Cheryl to the patio where she was hiding, Edwards brought her back to the bedroom, again forcing oral copulation and threatening harm to her family if she told.
 
 
 35
 The incidents allegedly occurred at the house of Cheryl's grandparents, the Alloways, at a time when her mother was incarcerated. On each occasion, Cheryl's sister, three years older, was allegedly sleeping in the bedroom where Cheryl was molested. Cheryl's grandparents also were said to have been in another part of the house during the molestations.
 
 
 36
 The state's case was undermined by the testimony of the Alloways who stated that Edwards never stayed at their house unless the three Alloway sons were there, and that none of the sons was home in late 1981, the time of the alleged molestations. The defense also cross-examined Cheryl about allegations she had made of molestations that had occurred before the incidents at the Alloway house. Cheryl said that Edwards had molested her previously in a residence on Park Marina Drive. She stated that Edwards was babysitting her there at the time. Her memory had been triggered when she and her mother coincidentally visited the house and Cheryl recognized the wallpaper. There was, however, no other evidence that Edwards ever babysat her or that either of them had been in the house on Park Marina Drive at any time within years of the alleged offense. In fact, the owner of the house, who had lived there continuously during the period involved, testified that she did not know any of the people involved in this case. The state did not charge Edwards with any misconduct based on the alleged Park Marina Drive incident.
 
 
 37
 These facts among others made it highly questionable that Cheryl was actually molested or if so, that Edwards committed the offense. It is in the light of this shaky case that one must determine whether introduction of the other offense charged by Kristen violated Edwards' right to a fair trial.
 
 
 38
 B. The Alleged Molestation of Kristen M.
 
 
 39
 In addition to the offenses related to Cheryl, the state had originally charged Edwards in this case with lewd and lascivious acts upon another child under the age of 14 years, Kristen M. The trial court granted Edwards' motion to sever the charges concerning Kristen. Nevertheless, the state introduced evidence of Kristen's molestation over objection to prove Edwards' identity as Cheryl's molester in this case.
 
 
 40
 Kristen's mother, Diane Miller, testified that Edwards came to her house one morning in October 1985. Connie Kozlowski, Diane's roommate, accompanied Edwards. Edwards stayed until the early afternoon, and sat with Kristen and Diane's other children watching television.
 
 
 41
 Late that night, Diane invited her friend, Keith, and Edwards to her home. They arrived at about 2:00 a.m. Edwards was wearing jeans, a buttoned-down shirt, and a sweater. When they arrived, Edwards asked where the children slept. Diane, Keith, and Edwards began to watch television, and Edwards asked to use the bathroom as he was not feeling well. Diane checked on Edwards about 10 minutes later, and found him lying in the hallway with his head between the bathroom door and the door to Kristen's bedroom. She left him alone and returned to the television. Diane checked on Edwards again about 20 minutes later. She found him in the same position. She returned to the living room, and Edwards followed her shortly. Keith left around 5:00 a.m., and Edwards left about two and a half hours later. That evening, Kristen told her mother that she had been molested the previous night.
 
 
 42
 Kristen testified that the man who molested her woke her by shaking her shoulder, then lit a match so that she could see him, and asked if she remembered him. He then touched her "in the private spot." Hearing a noise in the hall, he went out into the hall and lay down. After a few minutes he returned, and forced her to orally copulate him. Kristen's younger sister was asleep in the room at the time.
 
 
 43
 Kristen was not able to identify Edwards as her molester in court. She testified that her assailant wore jeans and a grey sweater. But she also stated that he had long hair, a tattoo on his chest, and three tattoos on his arms--one of them near his shoulder. Edwards' barber, who had cut his hair since he was in the eighth grade, testified that Edwards always wore his hair very short, above his ears. It was stipulated that Edwards had no tattoos or any removal marks.
 
 
 44
 C. Prior Act Evidence Probative of Identity.
 
 
 45
 Assuming that the government presented sufficient evidence that Edwards molested Kristen, see Cal.Evid.Code § 403 (West 1966); Fed.R.Evid. 104(a), the issue is whether Kristen's alleged molestation was sufficiently similar to Cheryl's alleged molestation to prove that the same person did both.
 
 
 46
 In United States v. Powell, 587 F.2d 443 (9th Cir.1978), we stated:
 
 
 47
 The probative value of evidence of other crimes where the issue is identity depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offenses and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense also committed the offense on trial.
 
 
 48
 Id. at 448 (citations omitted).
 
 
 49
 Similarly in United States v. Myers, 550 F.2d 1036 (5th Cir.1977), a distinguished panel of the Fifth Circuit stated:
 
 
 50
 A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. We have consistently held that for evidence of other crimes to be admissible the inference of identity flowing from it must be extremely strong. In United States v. Goodwin, [492 F.2d 1141, 1154] (5th Cir.1974), for example, we said that evidence of a prior crime was inadmissible to prove identity because the two crimes did not "bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual."
 
 
 51
 Id. at 1045-46 (citations omitted). See also id. at 1046 n. 17 (quoting E. Cleary, McCormick on Evidence § 190 at 449 (rev. ed. 1972) ("The device used must be so unusual and distinctive as to be like a signature.")).
 
 
 52
 Both Powell and Myers were direct appeals where the admission of the prior act evidence resulted in remand for a new trial. Of course, every improper admission of evidence does not rise to the level of a constitutional violation. As the majority correctly states, "[d]ue process requires that the admission not be 'arbitrary or fundamentally unfair,' so that it would deprive the defendant of a fair trial." In a case such as this, where the offense charged is based on questionable testimony, the improper introduction of an alleged other child molestation inevitably would have " 'substantial and injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. United States, 328 U.S. at 750, 776 (1946).
 
 
 53
 The similarities between the molestation of Kristen and that of Cheryl follow: (1) the two victims were about the same age; (2) oral copulation was forced on each girl; (3) the attackers were men who did not live in the house; (4) the offenses were committed when other adults were in the residences; and (5) in each incident the victim's sister was sleeping in the same room.
 
 
 54
 Forcing oral copulation on young girls is not an unusual feature of a child molestation case. Hundreds of such reported cases exist. Nor is there any evidence that it is unusual for the offenders not to live in the house where the molestation occurs. The majority focuses on the fact that the molestations occurred while other adults were in the residence and while the victim's sister slept in the same room. This, according to the majority, uniquely identifies the perpetrator as one who acts with "surprising boldness" and a "devil-may-care attitude." Opinion at ----.
 
 
 55
 We have no evidence that these features distinguish the molestations as signature crimes, as the majority's characterization suggests. Like the majority, I can claim no expertise in the ways of child molesters. We must remember that the burden of establishing the relevance of evidence rests with the party offering the evidence, in this case the state. United States v. Hernandez-Miranda, 601 F.2d 1104, 1108 (9th Cir.1979). The state did not, however, furnish expert testimony to indicate that it is unusual for a child molestation to occur in a room where another child is sleeping or in a house in which another adult is present. In fact, a cursory check of child molestation cases indicates that it is not uncommon for molesters to operate under these circumstances. See Coble v. State, 612 A.2d 157 (Del.Super.Ct.1992) (unpublished disposition) (defendant convicted of molesting child, but acquitted of touching another child sleeping in same room); Jannise v. State, 789 S.W.2d 623 (Tex.Crim.App.1990) (statements relating to sexual acts against second child sleeping in same room as allegedly molested child were admissible res gestae evidence); State v. Banks, 370 S.E.2d 398 (N.C.1988) (defendant convicted of waiting until all other adults were in another part of house, entering room where children lay, kissing and touching each of them, and threatening to strike children and kill their mother if they told anyone what he had done); State v. Carroll, 1985 WL 8687 (Ohio Ct.App. May 31, 1985) (defendant convicted of entering bedroom where three children were sleeping and molesting each of them while mother, who had permitted defendant to go upstairs to rest, was in another room of the house); Commonwealth v. Taylor, 471 A.2d 1228 (Pa.Super.Ct.1984) (defendant convicted of molesting his minor daughter and another minor female while staying in same motel room); State v. Dowell, 276 P. 39 (Idaho 1929) (evidence of prior intercourse or attempted intercourse with other girls under fifteen in victim's presence in same room); State v. Shtemme, 158 N.W. 48 (Minn.1916) (evidence of similar statutory rape with another young girl in victim's presence); Day v. State, 284 N.W.2d 666 (Wis.1979) (testimony of teenage complaining witness that she had intercourse with defendant in room with no doors that was only four feet away from another room containing group of people; see also Lawrence Wright, Remembering Satan-Part I, The New Yorker Magazine, May 17, 1993, at 60 (investigative report of alleged sexual molestation of sister while other sister slept in same room); Lawrence Wright, Remembering Satan-Part II, The New Yorker Magazine, May 24, 1993, at 54 (same).
 
 
 56
 In short, we do not have evidence that the alleged molestations of Kristen and Cheryl bore " 'such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual.' " Myers, 550 F.2d at 1045-46 (quoting Goodwin, 492 F.2d at 1154). I am even more skeptical that an inference of identity can be drawn from the two molestations when I consider the differences in the alleged offenses. They occurred years apart and at distant locations. Unlike Cheryl's attacker, the person who molested Kristen lit a match to show his face, made no attempt at vaginal or anal copulation, and made no threat to harm Kristen's family.
 
 
 57
 In the absence of expert testimony or other convincing evidence, I cannot join the majority in speculating about the behavioral characteristics of child molesters. I would hold that because the government failed to establish a distinctive link between the alleged molestations, the evidence of Kristen's molestation was irrelevant and inadmissible. Given the uncertain evidence that Cheryl was molested, let alone that Edwards was the molester, I have no doubt that the improper introduction of evidence of Kristen's alleged molestation " 'had substantial and injurious effect or influence in determining the jury's verdict.' " Brecht, 113 S.Ct. at 1714 (quoting Kotteakos, 328 U.S. at 776).
 
 
 58
 II. Prosecutorial Misconduct.
 
 
 59
 The magistrate who first heard this petition for habeas corpus recommended that it be granted because of the prosecutor's highly inflammatory closing argument. The state's theory of the case at trial was in part that Kristen believed her attacker had tattoos only because Edwards' investigator, Mr. Klingensmith, suggested that to her. Edwards' attorney, rebutting the state's theory in closing argument, stated:
 
 
 60
 But an investigator worth his salt is out there trying to find out what the facts are. He really goes out there. He's sent out there to find out what happened.... And very often he doesn't even know what it is that would be helpful to your case. He wants to know what the facts are. Because if you start trying to manufacture facts, [it might backfire, and] later on it might devastate your case.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 * * * So an investigator who is worth his salt is not going to try to get someone to say something that isn't true. Might be hurtful, and it's not going to last anyway. Because after going through a few hearings and cross examinations, they are just going to fall apart.
 
 
 64
 The prosecutor, in his closing argument, responded:
 
 
 65
 Well, I have been in the criminal law business for twenty years. And I have been a prosecutor for many years, and a defense attorney for many years. And when somebody comes in and looks you in the eye and tells you that they hire--defense attorney hires an investigator to go over there and find the facts is lying to you.
 
 
 66
 When Mr. Greisen says that Mr. Klingensmith--
 
 
 67
 MR. GREISEN: I think that's improper, your Honor. I will take exception to that.
 
 
 68
 THE COURT: Well, I think to suggest that the hiring of an investigator is somehow improper, Mr. Carlton, is not appropriate.
 
 
 69
 MR. CARLTON: I am not saying--ladies and gentlemen, I don't mean to state that hiring an investigator is inappropriate. It is very appropriate. But he's hired solely for the reason to help Kevin Edwards get a not guilty verdict. That's his only desire in the case. That's why he's hired. He's not hired to learn the facts. He's not hired to learn the facts. He's hired to get evidence that is going to help Kevin Edwards.
 
 
 70
 And when somebody comes in and says otherwise, that's a bunch of bull. That's a bunch of bull. And to say that Mr. Klingensmith went over there and interviewed this child, and didn't know that Mr. Edwards didn't have tattoos is a bunch of bull.
 
 
 71
 He went over there, and he wanted her to say some things that would eliminate Kevin Edwards. (Emphasis added.)
 
 
 72
 It was improper for the prosecutor to vouch for his views based on personal experience. United States v. McKoy, 771 F.2d 1207, 1210-11 (9th Cir.1985) ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established."). It was also improper for the prosecutor, without supporting evidence, to accuse the defense attorney of lying. Bruno v. Rushen, 721 F.2d 1193, 1194 (9th Cir.1983), cert. denied, 469 U.S. 920 (1984). Moreover, in light of the defense attorney's objection, the district court erred by failing to instruct the jury that the prosecutor's remarks were improper. Stano v. Dugger, 921 F.2d 1125, 1159 (11th Cir.) (en banc) (Anderson, J., concurring), cert. denied, 112 S.Ct. 116 (1991). The court merely advised the jury that it was inappropriate to suggest that hiring an investigator was improper. The court's comment was inadequate.
 
 
 73
 The majority believes that the defense attorney's attempt to portray his investigator in a favorable light invited the prosecutor's misconduct. I disagree. The defense attorney's statement that an investigator's role is to find the facts was within the realm of advocacy. Indeed, California statutes define "private investigator" in roughly the same terms. See Cal.Bus. & Prof.Code § 7521(a) (West 1975) (private investigator is one who is hired "for the purpose of obtaining[ ] information with reference to ... securing evidence to be used before any court, board, officer, or investigating committee"). The defense counsel's innocuous statement did not invite the prosecutor's intemperate remarks.
 
 
 74
 I would find nothing wrong with the prosecutor attempting to show that Mr. Klingensmith did more than merely obtain facts by using his manner of interrogation to suggest to Kristen that her attacker had tattoos. But when the prosecutor, based on his years of personal experience, gave his personal opinion that the defense attorney lied, that Edwards' investigator was not hired to learn the facts, and that to suggest otherwise is a "bunch of bull," he went beyond the realm of permissible advocacy.
 
 
 75
 In Bruno, we affirmed the granting of a writ of habeas corpus because the prosecutor "had labeled defense counsel's actions as unethical and perhaps even illegal without producing one shred of evidence to support his accusations." 721 F.2d at 1194. We concluded that "absent specific evidence in the record, no particular defense counsel can be maligned.... It therefore is an impermissible strike at the very due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice." Id. at 1195.
 
 III. Cumulative Error
 
 76
 Although I conclude that the prosecutorial misconduct deprived Edwards of his due process right to a fair trial, I concede that the violation, by itself, presents a close question. When the misconduct is considered cumulatively with the unquestionable due process violation of admitting evidence of Kristen's alleged molestation, however, I have no doubt that Edwards was deprived of a fair trial. See Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.") (citing United States v. Tucker, 716 F.2d 576, 595 (9th Cir.1983) ("a court may find unfairness--and thus prejudice--from the totality of counsel's errors and omissions"); Ewing v. Williams, 596 F.2d 391, 395 (9th Cir.1979) ("prejudice may result from the cumulative impact of multiple deficiencies")), cert. denied, 113 S.Ct. 1363 (1993).
 
 
 77
 Before, for all intents and purposes, Edwards' life is irreparably destroyed, he is entitled to a fair trial free from an erroneous admission of prior act evidence and prosecutorial misconduct. Because the combined errors were bound to have "had substantial and injurious effect or influence in determining the jury's verdict," I would reverse with instructions to grant the writ conditioned on retrial of Edwards without the prejudicial errors.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3